UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC. | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| | ) ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| v. | ) ) | |
| PEASE DEVELOPMENT AUTHORITY; DAVID R. MULLEN, in his official capacity as EXECUTIVE DIRECTOR of the PEASE DEVELOPMENT AUTHORITY; GEORGE M. BALD, in his official capacity as CHAIRMAN of the PEASE DEVELOPMENT AUTHORITY; PETER J. LOUGHLIN, in his official capacity as VICE CHAIRMAN of the PEASE DEVELOPMENT AUTHORITY; ROBERT A. ALLARD, in his official capacity as BOARD MEMBER of the PEASE DEVELOPMENT AUTHORITY; MARGARET F. LAMSON, in her official capacity as BOARD MEMBER of the PEASE DEVELOPMENT AUTHORITY; JOHN BOHENKO in his official capacity as BOARD MEMBER of the PEASE DEVELOPMENT AUTHORITY; FRANKLIN TORR, in his official capacity as BOARD MEMBER of the PEASE DEVELOPMENT AUTHORITY; and ROBERT PRESTON in his official capacity as BOARD MEMBER of the PEASE DEVELOPMENT AUTHORITY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**INTRODUCTION**

1.      This action is a citizen suit brought under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, as amended, to address violations of effluent standards and limitations including significant water-quality problems and programmatic deficiencies associated with the Pease Development Authority's ("PDA's") municipal separate storm sewer system. Plaintiff Conservation Law Foundation ("CLF") seeks declaratory judgment, injunctive relief, and other relief with respect to the actions and failures to act by PDA and the Executive Director, Chairman, Vice Chairman, and Board Members thereof. These actions and failures by PDA and the Executive Director, Chairman, Vice Chairman, and Board Members thereof have resulted in discharges of pollutants into waters of the United States without a municipal separate storm sewer system permit, in violation of Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342, and applicable Clean Water Act regulations.

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction over this action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

3.      Pursuant to Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), and 40 C.F.R. § 135, Plaintiff notified Defendants of their violations of the Clean Water Act, and of Plaintiff's intent to sue under the Clean Water Act, by letter dated and sent to them via certified mail on September 8, 2016 ("Notice Letter"). A true and accurate copy of the Notice Letter is attached as Exhibit 1. Plaintiff also sent copies of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region 1, and the New Hampshire Department of Environmental Services.

4.      More than sixty days have passed since Plaintiff mailed Defendants its Notice Letter. The

Clean Water Act violations complained of in the Notice Letter are of a continuing nature, ongoing, or reasonably likely to re-occur. Defendants remain in violation of the Clean Water Act. As of the filing of this Complaint, neither EPA nor New Hampshire has commenced an enforcement action to redress the violations identified in the Notice Letter.

5.     Venue is appropriate in the District of New Hampshire pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2), because PDA's municipal separate storm sewer system and the Clean Water Act violations that are the subject of this Complaint are located in New Hampshire, and PDA is a body politic and corporate of the State of New Hampshire.

**PARTIES**

6.     Plaintiff Conservation Law Foundation is a non-profit, member-supported environmental advocacy organization. With approximately 3,350 members, including approximately 450 members in New Hampshire, Conservation Law Foundation uses the law, science, and the market to solve problems threatening natural resources and communities. Conservation Law Foundation has a long history of working to protect the health of New England's and New Hampshire's water resources, including addressing significant sources of pollution, including but not limited to stormwater. For more than a decade, Conservation Law Foundation has actively worked to protect Great Bay, Little Bay, the Piscataqua River, and other waters collectively comprising the Great Bay estuary—which has been designated by the Environmental Protection Agency as one of twenty-eight estuaries of national significance—from pollution associated with growth and development, including stormwater pollution. In furtherance of this work, Conservation Law Foundation established in 2012, and continues to implement, the Great Bay-Piscataqua Waterkeeper, a program dedicated solely to restoring and protecting the health of

Great Bay, Little Bay, the Piscataqua River, and all the water bodies that collectively make up Great Bay estuary. Conservation Law Foundation members use and enjoy New England's and New Hampshire's water resources, including but not limited to Great Bay, Little Bay, the Piscataqua River, and other waters of the United States that are part of the Great Bay estuary, for boating, swimming, fishing, hunting, sightseeing, and other recreational and aesthetic purposes. Conservation Law Foundation has worked to ensure the Great Bay estuary receives the full protections of the Clean Water Act. Where necessary, Conservation Law Foundation engages in advocacy, including enforcement actions, to end illegal pollution and secure Clean Water Act compliance. Restoring and protecting water quality is critical to Conservation Law Foundation's members' use and enjoyment of waters, including Great Bay, Little Bay, the Piscataqua River, and other waters associated with the Great Bay estuary. Conservation Law Foundation's members have been and are adversely affected by PDA's violations of the Clean Water Act and, until such time as Defendants come into compliance, will continue to be so.

7. Defendant PDA is a body politic and corporate and public instrumentality of the State of New Hampshire.

8. PDA is the owner and operator of the Pease International Tradeport and Airport ("Pease International"), a 3,000-acre property with 40 percent of its land in the City of Portsmouth and 60 percent of its land in the Town of Newington.

9. PDA is responsible for managing stormwater at Pease International in compliance with the Clean Water Act.

10. Defendant David R. Mullen is the Executive Director of PDA and, in this official capacity, is responsible for ensuring that PDA and Pease International operate in a manner that complies with the Clean Water Act.

11.     Defendant George M. Bald is the Chairman of PDA and, in this official capacity, is responsible for ensuring that PDA and Pease International operate in a manner that complies with the Clean Water Act.

12.     Defendant Peter J. Loughlin is the Vice Chairman of PDA and, in this official capacity, is responsible for ensuring that PDA and Pease International operate in a manner that complies with the Clean Water Act.

13.     Defendants Robert A. Allard, Margaret F. Lamson, John Bohenko, Franklin Torr, and Robert Preston are Board Members of PDA and, in this official capacity, are responsible for ensuring that PDA and Pease International operate in a manner that complies with the Clean Water Act.

14.     PDA owns and operates a small municipal separate storm sewer system at Pease International pursuant to 40 C.F.R. §§ 122.26(b)(8) and (16). Specifically, Pease International owns and operates a system of conveyances discharging pollutants (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains), which are: (1) designed or used for collecting or conveying stormwater that is not a combined sewer or publicly owned treatment works, and (2) owned or operated by a public body created pursuant to state law and having jurisdictional authority over stormwater.

### STATUTORY BACKGROUND

15.     New Hampshire RSA § 12-G:3, I provides "[t]here is hereby created a body politic and corporate of the state, to be known as the Pease development authority, to carry out the provisions of this chapter. The authority is hereby deemed to be a public instrumentality, and the exercise by the authority of the powers conferred by this chapter shall be deemed and held to be the performance of public and essential governmental functions of the state."

16.     PDA has a governing body of seven members. Four members are appointed by the Governor and State legislative leadership, and three members are appointed by the City of Portsmouth and the Town of Newington. New Hampshire RSA § RSA 12-G:4.

17.     New Hampshire RSA 12-G:13, I states: "[n]otwithstanding any other provision of law, any and all land use controls of the town of Newington and the city of Portsmouth shall not apply to any of the property at Pease Air Force Base transferred, conveyed, or otherwise granted to the authority by the federal government or any agency thereof. The authority shall have the exclusive jurisdiction in adopting and establishing land use controls for the property at Pease Air Force Base transferred, conveyed, or otherwise granted to the authority by the federal government or any agency thereof."

18.     New Hampshire RSA § 12-G:14, IV(b), further provides that "[t]he provision of all other services to land, buildings, and people in the airport district which are traditionally provided by the town of Newington and/or the city of Portsmouth shall be exclusively the responsibility of the authority. These services shall include, but not be limited to, the provision of fire protection, roadway maintenance, runway and parking apron maintenance, maintenance of all underground storage facilities, public assistance, public education, and public utilities."

19.     The Clean Water Act is the principal federal statute enacted to protect the quality of the Nation's surface water resources. *See* Clean Water Act § 101 *et seq.*, 33 U.S.C. § 1251 *et seq.* The stated goal of the Clean Water Act is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." Clean Water Act § 101(a)(1), 33 U.S.C. § 1251(a)(1).

20.     Section 301 of the Clean Water Act, 33 U.S.C. § 1311, prohibits the discharge of any pollutant, by any person, from any point source, Clean Water Act § 502(12)(A), 33 U.S.C. §

1362(12)(A), to the waters of the United States, Clean Water Act § 502(7), 33 U.S.C. § 1362(7), except where expressly authorized under valid National Pollutant Discharge Elimination System ("NPDES") permits issued by EPA or an EPA-delegated State permitting authority, 40 C.F.R. § 122.2.

21.     "Point source" is defined broadly under Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), to include, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

22.     The State of New Hampshire has not established a federally approved state-administered NPDES program pursuant to Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b). Therefore, in New Hampshire, the NPDES permit program is administered by EPA pursuant to Section 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a).

23.     Small municipal separate storm sewer systems are required to obtain NPDES permit coverage for their stormwater discharges, pursuant to the statutory mandate set forth in Section 402(p)(6) of the Clean Water Act, 33 U.S.C. § 1342(p)(6). 40 C.F.R. §§ 122.30–.37.

24.     A "municipal separate storm sewer" is defined as a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains) (i) owned or operated by a public body created by or pursuant to State law having jurisdiction over disposal of sewage, industrial wastes, stormwater, or other wastes (ii) designed or used for collecting or conveying stormwater, (iii) which is not a combined sewer, and (iv) which is not part of a Publicly Owned Treatment Works. 40 C.F.R. § 122.26(b)(8).

25.     "Small municipal separate storm sewer systems" are defined in pertinent part as separate storm sewers that are (i) owned or operated by a public body created by or pursuant to State law having jurisdiction over disposal of sewage, industrial wastes, stormwater, or other wastes and (ii) not defined as large or medium municipal separate storm sewer systems or designated by the EPA as contributing to a violation of a water quality standard or pollutants to waters of the United States. Small municipal separate storm sewer systems include systems similar to separate storm sewer systems in municipalities, such as systems at military bases, large hospital or prison complexes, and highways and other thoroughfares. *Id.* § 122.26(b)(16).

26.     Small municipal separate storm sewer system operators are required to obtain NPDES permit coverage if their small municipal storm sewer system is located in an urbanized area as determined by the latest Decennial Census by the Bureau of the Census. *Id* § 122.32.

27.     In May 2003, EPA issued a General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems that applies to small municipal separate storm sewer systems in the State of New Hampshire. This permit expired on May 1, 2008 but remains in effect until a new permit is issued. NPDES Availability Notice, 73 Fed. Reg. 78786 (Dec. 23, 2008).

28.     EPA released a draft new general permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems and accepted public comments on that draft new permit until November 20, 2015. NPDES Re-opening of Public Comments Notice, 80 Fed. Reg. 52751 (Sept. 1, 2015). This draft new permit contains more rigorous requirements than the current General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems that EPA issued in 2003. EPA has not finally adopted the new permit.

29.     EPA's 2003 General Permit for Stormwater Discharges from Small Municipal Separate

Storm Sewer Systems requires regulated small municipal separate storm sewer system operators in New Hampshire to, at a minimum, develop, implement, and enforce a stormwater management program, which must detail the stormwater control practices that will be implemented consistent with permit requirements to reduce the discharge of pollutants from the small municipal separate storm sewer systems to the maximum extent practicable. 40 C.F.R. § 122.34.

30.     Section I.B.2.(k) of EPA's 2003 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems provides that discharges are not authorized under permit that "would cause or contribute to instream exceedance of water quality standards. The storm water management program must include a description of BMPs that will ensure this will not occur. . . ."

31.     Section I.B.2.(l) of EPA's 2003 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems provides that discharges are not authorized under the permit "of any pollutant into any water for which a Total Maximum Daily Load (TMDL) has been established or approved by EPA unless the discharge is consistent with the TMDL . . ."

32.     Section I.B.2.(i) of EPA's 2003 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems provides that discharges are not authorized under the permit that are "prohibited under 40 CFR 122.4 [sic].   This includes discharges not in compliance with the state's antidegradation policy."

33.     Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."

34.    Such enforcement action under Clean Water Act Section 505(a)(1) includes an action seeking remedies for unauthorized discharge under Section 301 of the Clean Water Act, 33 U.S.C § 1311, as well as for violation of a permit condition under Sections 402 and 505(f) of the Clean Water Act, 33 U.S.C. § 1342, and Section 505(f) of the Clean Water Act, 33 U.S.C. § 1365(f).

35.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring from January 12, 2009 through November 2, 2015 and $51,570 for penalties assessed on or after August 1, 2016 for violations that occurred after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d) and 1365(a), and to 40 C.F.R. §§ 19.1–.4.

## FACTUAL BACKGROUND

36.    Stormwater runoff contains a wide variety of pollutants, including priority organics, toxic chemicals, oil and grease, metals, nutrients, organic constituents, suspended solids, and pathogens. Stormwater runoff and surface water discharges from municipal separate storm sewers are a major cause of water quality impairment in rivers, lakes, estuaries and coastal areas across the United States and in New Hampshire. Stormwater runoff causes exceedances of water quality standards by contributing significant amounts of pollution to receiving waters, changing natural hydrologic patterns, accelerating stream flows, destroying aquatic habitat, and elevating pollutant concentrations and loadings.

37.    Stormwater is a significant source of water pollution in New Hampshire. Stormwater is causing or contributing to 83 percent of water quality impairments documented by the New Hampshire Department of Environmental Services.[1] Stormwater pollution also is a significant

---

[1] *See* N.H. Dept. of Envt'l Serv., *New Hampshire 2012 Section 305(b) & 303(d) Surface Water Quality Report* 85 (2012), http://des.nh.gov/organization/divisions/water/wmb/swqa/2012/documents/nh-2012-305b-r-wd-12-4.pdf.

and growing concern in New Hampshire's coastal watersheds (including the Great Bay estuary watershed) where, during the twenty years spanning 1990 to 2010, the amount of impervious surface cover (e.g., paved surfaces and rooftops) increased 120 percent (from 28,695 acres to 63,241 acres).[2]

38.     The Great Bay estuary has been in a state of decline, demonstrating signs of eutrophication such as the loss of essential eelgrass habitat, the increasing presence of macroalgae, and declining water clarity. In the Great Bay estuary stormwater accounts for the delivery of 280 tons per year of total nitrogen – the pollutant of greatest concern to the estuary's health – with urban runoff accounting for 42 percent of that load.[3] The New Hampshire Department of Environmental Services and EPA have identified the reduction of nitrogen and other pollutants as a top priority for restoring the Great Bay estuary.[4] EPA has recognized the importance of reducing nitrogen from *all* sources, particularly municipal separate storm sewer systems in urban areas.[5]

39.     As has found to be the case in surface waters directly affected by Pease International, stormwater pollution in the Great Bay estuary watershed can contain numerous pollutants in addition to nitrogen, such as bacteria, sediments, and toxic chemicals.[6]

40.     Pease International encompasses more than 4 million square feet of development and includes systems of conveyances, including roadways, storm drains, storm sewers, and drainage

---

[2] *See* Piscataqua Region Estuaries P'ship, *State of Our Estuaries* 10 (2013), http://www.prep.unh.edu/resources/pdf/2013%20SOOE/SOOE_2013_FA2.pdf. In Newington, the amount of impervious surface cover increased from 13 percent in 1990 to 23.8 percent in 2010. *Id.* at 11. During this same timeframe, the amount of impervious surface cover in Portsmouth increased from 21.4 percent to 35.1 percent. *Id.*

[3] *See* N.H. Dept. of Envt'l Serv., *Great Bay Nitrogen Non-Point Source Study* 23 (2014), http://des.nh.gov/organization/divisions/water/wmb/coastal/documents/gbnnpss-report.pdf.

[4] *See* N.H. Dept. of Envt'l Serv., *supra* note 1, at 87.

[5] *See* U.S. Envt'l Prot. Agency, *Fact Sheet, Draft General Permits for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems* 22 (2013), https://www3.epa.gov/region1/npdes/stormwater/nh/2013/NHMS4-FactSheet-2013-WithAttachments.pdf.

[6] *See* Danielle L. Morin & Dr. Stephen H. Jones, *Environmental Quality Characterization for Hodgson Brook in Portsmouth, New Hampshire* (2003).

ditches.

41.     Over 250 companies are located at Pease International.

42.     Over 9,525 people work at Pease International.

43.     PDA reported revenues of $13,902,000 and assets valued at $79,320,691 in 2015.

44.     Pease International generates stormwater runoff containing pollutants from streets, roofs, municipal buildings, municipal infrastructure and parking lots. These pollutants include, but are not limited to, heavy metals, nutrients, bacteria, hydrocarbons, and the toxic chemicals Perfluorooctanesulfonate ("PFOS") and Perfluorooctanoate ("PFOA") (collectively, "PFCs").

45.     The toxic chemicals PFOS and PFOA are of growing concern, particularly for developing fetuses and newborns. These chemicals have resulted in the closure of a Portsmouth drinking water well at Pease International, as well as drinking water contamination elsewhere in New Hampshire.

46.     According to the EPA, which compiles Waterbody Quality Assessment Reports, water quality is impaired for a number of waters into which Pease International discharges stormwater directly or indirectly. Pease International discharges into Newfields Ditch (Waterbody ID NHRIV600031001-10), Upper Hodgson Brook (Waterbody ID NHRIV600031001-05), Lower Hodgson Brook (Waterbody ID NHRIV600031001-04), North Mill Pond (Waterbody ID NHEST600031001-10), the Lower Piscataqua River–South (Waterbody ID NHEST600031001-02-02), Pickering Brook and Flagstone Brook (Waterbody ID NHRIV600031001-01), Lower Little Bay General Sullivan Bridge (Waterbody ID  NHEST600030904-04-04), Lower Little Bay Marina  SZ (Waterbody  ID  NHEST600030904-06-14),  Lower  Piscataqua  River–North (Waterbody ID NHEST600031001-02-01), McIntyre Brook (Waterbody ID NHRIV600030904-11), Fabyan Point (Waterbody ID NHEST600030904-04-04),  Great  Bay (Waterbody  ID

NHEST600030904-04-05), Lower Grafton Brook (Waterbody ID NHRIV600031001-06), "Unnamed Brook–to Unnamed Marsh" (Waterbody ID NHRIV600030904-07), Kennard Dam (Waterbody ID NHIMP600030904-0), "Unnamed Brook–through Unnamed Marsh to Great Bay" (Waterbody ID NHRIV600030904-08), Pickering Brook (Waterbody ID NHEST600030904-04-03), Peverly Brook (Waterbody ID NHRIV600030904-12), Peverly Brook Pond (Waterbody ID NHLAK600030904-01), "Unnamed Brook–to Piscataqua River" (Waterbody ID NHRIV600031001-02), and Lower Little Bay (Waterbody ID NHEST600030904-06-18) (collectively, the "Receiving Waterbodies"), which are all waterbodies within the Piscataqua–Salmon Falls watershed. EPA has designated these waterbodies variously as habitats for "fish, shellfish, and wildlife protection and propagation," "aquatic life harvesting," "public water supply," and recreation.

47.     Pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), EPA has designated the Receiving Waterbodies as impaired for failure to meet minimum water quality standards. The Receiving Waterbodies are variously impaired for, or otherwise polluted with, chloride, dioxins (including 2,3,7,8-TCDD), impaired biota (benthic macroinvertebrate bioassessments, habitat assessment for streams, and estuarine bioassessments), organic enrichment (dissolved oxygen saturation), pathogens (namely *Escherichia coli*, or *E. coli*, *Enterococcus* bacteria, and fecal coliforms), turbidity (light attenuation coefficient), nutrients (namely nitrogen), aluminum, arsenic, cadmium, chromium, copper, iron, lead, manganese, mercury, zinc, polychlorinated biphenyls ("PCBs"), PFOS, PFOA, and pH.

48.     PDA's stormwater discharges contain pollutants including, but not limited to: petroleum hydrocarbons, nitrogen, phosphorus, total suspended solids, arsenic, iron, nickel, zinc, lead, polycyclic aromatic hydrocarbons, surfactants, cyanide, propylene glycol, volatile organics

(including acetone), bacteria (including *E. coli*, enterococci and fecal coliform), nitrate, ammonium, phosphate, pesticides, PFCs and other pollutants. PDA's outfalls that discharge stormwater with some combination of the above pollutants, include, but are not limited to, outfalls identified as "001-A", "002-A", "003-A", and "004-A", which discharge directly or indirectly into the Receiving Waterbodies, including Hodgkins Brook (alternatively, "Hodgson Brook"), Flagstone Creek, McIntyre Brook, Newfield Ditch, and Grafton Ditch (alternatively, "Grafton Brook", "Grafton Creek", or "Harvey's Creek").

49.     Monitoring programs with sampling locations at and around Pease International have shown PDA's stormwater discharges to be main contributors of pollutants to Hodgkins Brook (alternatively, "Hodgson Brook") and other nearby waters of the United States. These discharges occur, at a minimum, every time there is a one inch or greater precipitation or snow and ice melt event.

50.     Pease International was previously used by the Pease Air Force Base, which closed in 1991. In April 1989, the New Hampshire legislature established the Pease Redevelopment Commission, whose primary responsibility was to plan for the closure and redevelopment of Pease Air Force Base. The Pease Redevelopment Commission's deliberations led to the 1990 establishment of PDA.

51.     On June 1, 1990, PDA was established as a public agency by the State of New Hampshire: "[t]here is hereby created a body politic and corporate of the state, to be known as the Pease development authority, to carry out the provisions of this chapter. The authority is hereby deemed to be a public instrumentality, and the exercise by the authority of the powers conferred by this chapter shall be deemed and held to be the performance of public and essential governmental functions of the state." New Hampshire RSA § 12-G:3, I.

52.     In 1992, the United States Air Force and PDA signed an Airport Public Benefit Transfer Application (Contract for Sale) and Lease of Airport Property for 1,702 acres of the Pease International property for the purpose of developing a public airport. In 1997, the remaining 1,300 acres of the Pease International property were transferred to PDA through an Airport Public Benefit Transfer Application (Contract for Sale) similar to the previous transfer.

53.     PDA is an agency of the State of New Hampshire with jurisdiction over disposal of sewage, industrial wastes, stormwater, or other wastes.

54.     PDA operates independently from Portsmouth and Newington, administering its own zoning regulations, which are controlled by an agreement with the federal government.

55.     PDA operates a small municipal separate storm sewer system at Pease International, which is located in an urbanized area as determined by the latest Decennial Census by the Bureau of the Census.

56.     Pease Air Force Base maintained a sanitary sewer system and a separate storm sewer system, which remain in place at the Pease International.

57.     Stormwater collection systems drain a large portion of Pease International. Pease Air Force Base developed drainage ditches and storm sewers, which still exist at Pease International, designed to collect stormwater runoff and ultimately convey it to navigable waters.

58.     PDA maintains an interagency municipal services agreement with Portsmouth and Newington regarding the provision of services within the airport district and Pease International. Within this agreement, Portsmouth agreed with PDA to conduct maintenance on the roads, ditches, catch basins, and storm drains at the Pease International.

59.     The interagency municipal services agreement PDA maintains with Portsmouth and Newington expressly excludes stormwater permitting and stormwater regulatory obligations.

60.    The City of Portsmouth is not responsible or liable for compliance with the small municipal separate storm sewer system NPDES permit on behalf of PDA.

61.    Portsmouth, under agreement with PDA, owns and operates the wastewater collection system and wastewater treatment facility for Pease International. Portsmouth also owns three wells at Pease International and operates the drinking water system at Pease International.

62.    Portsmouth's wastewater collection system services Pease International. Pursuant to the interagency municipal services agreement, Portsmouth operates and maintains the publicly owned treatment works on the Pease International property, including wastewater collection and treatment facilities at Pease International consisting of approximately 15 miles of sewer lines, one pumping station, and a wastewater treatment plant.

63.    The Pease International wastewater treatment facility treats an average of 1.2 million gallons per day of sanitary wastewater in the Pease International area to secondary treatment standards.

64.    The Pease International stormwater collection system remains separate from the wastewater collection system and does not convey discharges to the publicly owned treatment works.

65.    On August 8, 2000, EPA issued PDA NPDES Permit NO. NH0090000 under Section 402 of the Clean Water Act, authorizing the discharge of wastewater and industrial stormwater from a Pease International facility located at 135 Corporate Drive, Portsmouth, New Hampshire to the following receiving waters: Piscataqua River, Hodgkins Brook, Flagstone Creek, McIntyre Brook and Harvey's Creek. The wastewater and industrial stormwater permit became effective September 7, 2000 and, like all NPDES permits, had a term of five years. This wastewater and industrial stormwater permit has been expired since September 7, 2005 and has been

administratively continued for the last eleven years.

66.    NPDES Permit No. NH0090000 authorized the discharge of treated sanitary and industrial wastewater from a wastewater treatment plant through "Outfall 005."

67.    NPDES Permit No. NH0090000 authorized the discharge of "storm water runoff from industrial activity" through four outfalls: Outfalls 1 discharging to Hodgkins Brook, Outfall 002 discharging to Flagstone Creek, Outfall 003 discharging to McIntyre Brook, and Outfall 004 discharging to Harveys Creek.

68.    The 2003 New Hampshire small municipal separate storm sewer system permit is designed to require operators of municipal separate storm sewer systems like PDA to reduce the discharge of pollutants from their municipal systems to the maximum extent practicable, and includes the following requirements to address discharges from small municipal separate storm sewer systems, among others:

   a. Operators like PDA must develop, implement, and enforce a stormwater management program;

   b. Operators like PDA must address stormwater runoff from new development and redevelopment;

   c. Operators like PDA must reduce pollutants in stormwater runoff from construction activities;

   d. Operators like PDA must provide opportunities for the public to participate in the development, implementation and review of the operator's stormwater management program.

69.    NPDES Permit No. NH0090000 did not include or address key provisions of the 2003 New Hampshire small municipal separate storm sewer system permit, including those provisions

described at Paragraph 68, above.

70.     Neither PDA, nor any other entity on PDA's behalf, has, as of the date of this complaint, sought coverage under the permitting program for municipal separate storm sewer systems at Pease International.

## CLAIMS FOR RELIEF

### Count I – Violations of Clean Water Act
### Failure to Obtain and Comply with Small Municipal Separate Storm Sewer System ("Small MS4") Permit

71.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

72.     Operators of small municipal separate storm sewer systems located in an urbanized area as determined by the latest Decennial Census by the Bureau of the Census are automatically required by rule to obtain an NPDES permit under the Clean Water Act and are thus required to obtain coverage under a small municipal separate storm sewer system permit. 40 C.F.R. § 122.32(a).

73.     EPA is the relevant Clean Water Act NPDES permitting authority for PDA. In May 2003, EPA issued a General Permit for Stormwater Discharges from Small Municipal Storm Sewer Systems that applies to small municipal separate storm sewer systems in the State of New Hampshire.

74.     PDA operates a small municipal separate storm sewer system at Pease International, which is located in an urbanized area as determined by the latest Decennial Census by the Bureau of the Census. Thus, PDA is required to obtain coverage under a small municipal separate storm sewer system permit. *Id*.

75.     Each and every day since at least November 10, 2011, on which PDA has discharged and

continues to discharge stormwater from its municipal separate storm sewer system at Pease International without authorization under a small municipal separate storm sewer system permit is s separate and distinct violation of the Clean Water Act, Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

**Count II – Violations of Clean Water Act**
**Unauthorized Discharge of Pollutants into Waters of the United States**

76.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

77.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from any "point source" to waters of the United States, except for discharges in compliance with an NPDES permit issued pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

78.    Operators of a small municipal separate storm sewer system in the State of New Hampshire are required to obtain Clean Water Act permit coverage under the small municipal separate storm sewer system permit.

79.    In order to be authorized to discharge lawfully under the small municipal separate storm sewer system permit, operators of small municipal separate storm sewer systems must meet the requirements set forth in this permit.

80.    These municipal separate storm sewer system permit requirements are more stringent than the requirements set out in permits for discharges of stormwater associated with industrial activity.

81.    These municipal separate storm sewer system permit requirements are designed to reduce the discharge of pollutants from the municipal separate storm sewer system to the maximum extent practicable. These requirements that are applicable to municipal separate storm sewer

systems, rather than industrial dischargers, include (a) addressing stormwater runoff from new development and redevelopment, (b) reducing pollutants in stormwater runoff from construction activities, (c) implementing public outreach and participation programs, and (d) developing, implementing, and enforcing a stormwater management program, which must detail the stormwater control practices that are implemented consistent with permit requirements to minimize the discharge of pollutants. 40 C.F.R. § 122.34.

82.    PDA is an operator of a small municipal separate storm sewer system in the State of New Hampshire that has not obtained coverage under the small municipal separate storm sewer system permit.

83.    PDA discharges stormwater containing pollutants from its municipal separate storm sewer system at Pease International in violation of the Clean Water Act into Great Bay, the Piscataqua River, and other waters making up the Great Bay estuary on every day of precipitation, including but not limited to precipitation events of greater than one inch and every instance of comparable snowmelt.

84.    PDA's discharges of stormwater from its municipal separate storm sewer system at Pease International are discharges of pollutants within the meaning of the Clean Water Act Section 502(12), 33 U.S.C. § 1362(12), as well as "point source" discharges into waters of the United States.

85.    Municipal separate storm sewer system discharges at Pease International discharge pollutants to waters of the United States in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

86.    Since at least November 11, 2011, PDA has discharged and continues to discharge stormwater from the municipal separate storm sewer system at Pease International without

obtaining coverage under a valid NPDES small municipal separate storm sewer system permit as required by the Clean Water Act Section 301(a), 33 U.S.C. § 1311(a).

87.    PDA has discharged and continues to discharge stormwater containing pollutants from its small municipal separate storm sewer system at Pease International without permit coverage since at least November 11, 2011. Each discharge constitutes a distinct violation of the Clean Water Act, Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

**Count III – Violations of Clean Water Act**
**Failure to Submit to EPA a Complete Notice of Intent to be Covered under the Small MS4 Permit**

88.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

89.    EPA is the relevant NPDES permitting authority for PDA. In May 2003, EPA issued a General Permit for Stormwater Discharges from Small Municipal Storm Sewer Systems that applies to small municipal separate storm sewer systems in the State of New Hampshire.

90.    Operators of small municipal separate storm sewer systems in the State of New Hampshire are therefore required to obtain coverage under the small municipal separate storm sewer system permit by submitting a Notice of Intent. 40 C.F.R. § 122.33(b).

91.    PDA has failed and continues to fail to submit a complete and accurate Notice of Intent to obtain coverage under the small municipal separate storm sewer system permit.

92.    Each and every day since at least November 10, 2011 on which PDA has not filed a complete and accurate Notice of Intent is a separate and distinct violation of the Clean Water Act, Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

**Count IV – Violations of Clean Water Act**
**Failure to Develop, Update, Evaluate, Implement, and Enforce a Stormwater Management Plan**

93.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

94.    Operators of regulated small municipal separate storm sewer systems are required to develop, implement, and enforce a stormwater management plan designed to reduce the discharge of pollutants from the small municipal separate storm sewer system to the maximum extent practicable, to protect water quality, and to satisfy the appropriate water quality requirements of the Clean Water Act, which plan must include the minimum control measures described in 40 C.F.R. § 122.34(b).

95.    As an operator of a regulated small municipal separate storm sewer system, PDA is required to develop, implement, and enforce a stormwater management plan. 40 C.F.R. § 122.34(a).

96.    PDA has failed and continues to fail to develop and implement a complete stormwater management plan for Pease International.

97.    Each and every day since at least November 10, 2011 on which PDA has failed and continues to fail to develop and fully implement a complete and accurate stormwater management plan for Pease International, and to keep such stormwater management plan on file at Pease International together with all other required documentation, is a separate and distinct violation of the small municipal separate storm sewer system permit and the Clean Water Act Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

## Count V – Violations of Clean Water Act
## Failure to Reduce Pollutants to the Maximum Extent Practicable

98.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

99.    Operators of regulated small municipal separate storm sewer systems are required to develop, implement, and enforce a stormwater management plan designed to reduce the discharge of pollutants from the small municipal storm sewer system to the maximum extent practicable, *inter alia*.

100.    As an operator of a regulated small municipal separate storm sewer system, PDA is required to reduce the discharge of pollutants from the small municipal storm sewer system to the maximum extent practicable as part of its stormwater management plan. 40 C.F.R. § 122.34(a).

101.    PDA has failed and continues to fail to develop and implement a complete stormwater management plan for Pease International, thus, PDA has failed and continues to fail to reduce the discharge of pollutants from its regulated small municipal separate storm sewer system to the maximum extent practicable.

102.    Each and every day since at least November 10, 2011 on which PDA has violated or continues to violate the requirement that it reduce the discharge of pollutants to the maximum extent practicable is a separate and distinct violation of the small municipal separate storm sewer system permit and the Clean Water Act Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

## Count VI – Violations of Clean Water Act
## Failure to Implement Minimum Control Measures

103.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

104. As part of a stormwater management plan, operators of regulated small municipal separate storm sewer systems are required to implement certain minimum control measures:

    a. Public education and outreach on stormwater impacts (including a public education program to distribute educational materials to the community or conduct equivalent outreach activities about the impacts of stormwater discharges and the steps that the public can take to reduce pollutants in stormwater runoff);

    b. Public involvement/participation (including providing opportunity for the public to participate in the development, implementation and review of the stormwater management program);

    c. Illicit discharge detection and elimination, in the form of a program to detect and eliminate illicit discharges, as defined by 40 C.F.R. §122.26(b)(2);

    d. Construction site stormwater runoff control;

    e. Post-construction stormwater management in new development and redevelopment; and

    f. Pollution prevention/good housekeeping for municipal operations.

105. PDA has failed and continues to fail to develop and implement a complete stormwater management plan for Pease International, thus, PDA has failed and continues to fail to implement certain minimum control measures as set forth by 40 C.F.R. §122.26(b).

106. Each and every day since at least November 10, 2011 on which PDA has failed to implement control measures is a separate and distinct violation of the small municipal separate storm sewer system permit and the Clean Water Act Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

**Count VII – Violations of Clean Water Act**
**Failure to Carry Out Required Reporting and Recordkeeping**

107.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

108.    Operators of municipal separate storm sewer systems are required to comply with reporting and recordkeeping pursuant to 40 C.F.R. §122.34(g)(2) and the applicable small municipal separate storm sewer system permit.

109.    Reporting and recordkeeping requirements include: (1) keeping and making available to the public information used in the development of the stormwater management program, monitoring, reports, and data used in the development of the Notice of Intent for at least five years and (2) submitting an annual report to EPA.

110.    PDA has failed and continues to fail to carry out the required reporting and recordkeeping pursuant to 40 C.F.R. §122.34(g)(2) and the applicable small municipal separate storm sewer system permit for Pease International.

111.    Each and every day since November 10, 2011, on which PDA has operated and continues to operate Pease International without complying with the required reporting and recordkeeping for Pease International pursuant to the New Hampshire small municipal separate storm sewer system permit is a separate and distinct violation of the small municipal separate storm sewer system permit and the Clean Water Act Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

**Count VIII – Violations of Clean Water Act**
**Failure to meet the requirements the Small MS4 Permit, including under Section I.B.2**

112.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

113.    Operators of municipal separate storm sewer systems are required to comply with the applicable small municipal separate storm sewer system permit, including the provisions

referenced in paragraphs 30 to 32 of this Complaint.

114.    PDA has failed and continues to fail to comply with these permit requirements, including as set out in (a)-(c) below,

    a. PDA has failed to meet the requirements of Section I.B.2.(k) of EPA's 2003 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems.

    b. PDA has failed to meet the requirements of Section I.B.2.(l) of EPA's 2003 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems.

    c. PDA has failed to meet the requirements of Section I.B.2.(i) of EPA's 2003 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems.

115.    Each and every day since November 10, 2011, on which PDA has operated and continues to operate Pease International without complying with the applicable small municipal separate storm sewer system permit provisions, including the provisions referenced in paragraphs 115(a) through (c) above, is a separate and distinct violation of the small municipal separate storm sewer system permit and the Clean Water Act Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

### RELIEF REQUESTED

116.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

    a. Declare PDA to have violated and to be in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for their unlawful and unauthorized discharges of pollutants into waters of the United States;

b.  Declare PDA to have violated and to be in violation of Section 402 of the Clean Water Act, 33 U.S.C. § 1342, for their failure to seek coverage under the applicable small municipal separate storm sewer system permit and failure to comply with all applicable requirements of that permit's NPDES program for Pease International;

c.  Enjoin PDA from discharging pollutants from Pease International and into the surface waters surrounding and downstream from Pease International, including Great Bay, the Piscataqua River, and other waters making up the Great Bay estuary, except as authorized by and in compliance with the small municipal separate storm sewer system permit.

d.  Order PDA to comply fully and immediately with all applicable requirements of the small municipal separate storm sewer system permit applicable to Pease International;

e.  Order PDA to pay civil penalties of up to $37,500 per day per day per violation for all Clean Water Act violations occurring between January 12, 2009 and November 2, 2015, and up to $51,570 per day per violation for all Clean Water Act violations occurring after November 2, 2015 pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the regulations governing the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §§ 19.2 and .4;

f.  Order PDA to take appropriate actions to restore the quality of waters harmed by its discharges and to remedy harm to the surrounding ecosystems and communities affected by PDA's noncompliance with the Clean Water Act;

g.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, and

consultant fees) as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C.

§ 1365(d); and

h.  Award any such other and further relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiff requests a jury trial on the issue of liability and any other issue cognizable by a jury.


Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.

Dated: November 10, 2016

By its attorneys,

/s/ Zachary K. Griefen
Zachary K. Griefen, Esq.
Conservation Law Foundation
NH Bar No. 265172
15 East State Street, Suite 4
Montpelier, VT 05602
802.223.5992 x4011
zgriefen@clf.org

/s/ Thomas F. Irwin
Thomas F. Irwin, Esq.
Conservation Law Foundation
NH Bar No. 11302
27 North Main Street
Concord, NH 03301
(603) 225-3060
tirwin@clf.org

/s/ Seth Kerschner
Seth Kerschner, Esq.*
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8630
Seth.kerschner@whitecase.com
*Pro Hac Vice Application Filed Concurrently with Complaint

<u>/s/ Matt Wisnieff</u>
Matt Wisnieff, Esq.*
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8248
matthew.wisnieff@whitecase.com
*<i>Pro Hac Vice Application Filed Concurrently with Complaint</i>