UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Conservation Law Foundation, Inc.,
    Plaintiff

    v.                              Case No. 16-cv-493-SM
                                    Opinion No. 2017 DNH 202
Pease Development Authority;
David R. Mullen; George M. Bald;
Peter J. Loughlin; Robert A. Allard;
Margaret F. Lamson; John Bohenko;
Franklin Torr; and Robert Preston,
    Defendants

## O R D E R

Plaintiff Conservation Law Foundation, Inc. ("CLF") brings suit under the Clean Water Act against the Pease Development Authority ("PDA"), PDA's Executive Director, David R. Mullen, its Chairman, George M. Bald, Vice Chairman, Peter J. Loughlin, and Board members, Robert A. Allard, Margaret F. Lamson, John Bohenko, Franklin Torr, and Robert Preston (collectively, "the individual defendants").

CLF alleges that the PDA is discharging pollutants into waters of the United States without the proper permit. It brings this action under the citizen suit provision of the Clean Water Act, which allows private suits against any person alleged to be in violation of an "effluent standard or limitation." 33 U.S.C. § 1365(a)(1)(A). Defendants have moved to dismiss the

case under Federal R. Civ. P. 12(b)(1) and 12(b)(6).  The motion
is granted in part, and denied in part.

<u>**STANDARD OF REVIEW**</u>

When ruling on a motion to dismiss under Fed. R. Civ. P.
12(b)(6), the court must "accept as true all well-pleaded facts
set out in the complaint and indulge all reasonable inferences
in favor of the pleader."  <u>SEC v. Tambone</u>, 597 F.3d 436, 441
(1st Cir. 2010).  Although the complaint need only contain "a
short and plain statement of the claim showing that the pleader
is entitled to relief," Fed. R. Civ. P. 8(a)(2), it must allege
each of the essential elements of a viable cause of action and
"contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face," <u>Ashcroft v.</u>
<u>Iqbal</u>, 556 U.S. 662, 678 (2009) (citation and internal
punctuation omitted).

In other words, "a plaintiff's obligation to provide the
'grounds' of his 'entitlement to relief' requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do."  <u>Bell Atl. Corp. v.</u>
<u>Twombly</u>, 550 U.S. 544, 555 (2007).  Instead, the facts alleged
in the complaint must, if credited as true, be sufficient to
"nudge[] [plaintiff's] claims across the line from conceivable to
plausible."  <u>Id</u>. at 570.  If, however, the "factual allegations

in the complaint are too meager, vague, or conclusory to remove

the possibility of relief from the realm of mere conjecture, the

complaint is open to dismissal." <u>Tambone</u>, 597 F.3d at 442.


When considering a motion to dismiss under Rule 12(b)(1),

the Court should apply a standard of review "similar to that

accorded a dismissal for failure to state a claim" under Rule

12(b)(6). <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir.

1995)). However, "[w]hen considering a motion to dismiss for

lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), a

court may need to consider extrinsic materials submitted by a

plaintiff even when reviewing a facial challenge to

jurisdiction." <u>Pitroff v. United States</u>, No. 16-CV-522-PB, 2017

WL 3614436, at *3 (D.N.H. Aug. 22, 2017) (citing <u>Dynamic Image</u>

<u>Techs., Inc. v. United States</u>, 221 F.3d 34, 37 (1st Cir. 2000)).

"In contrast, the court ordinarily should confine its review to

the complaint and a limited subset of documents such as those

incorporated in the complaint by reference and matters of public

record when determining whether the complaint states a claim for

relief." <u>Id</u>. (citing <u>Trans-Spec Truck Serv. v. Caterpillar,</u>

<u>Inc.</u>, 524 F.3d 315, 321 (1st Cir. 2008)).

## BACKGROUND

Accepting the allegations in the amended complaint as true, the relevant facts appear to be as follows.

The parties dispute whether the Pease Development Authority is required to secure a small municipal separate storm sewer system permit under the Clean Water Act, also known as a "small MS4 permit." The Clean Water Act prohibits the discharge of any pollutant by any person from any point source[1] to the waters of the United States except where expressly authorized under valid National Pollutant Discharge Elimination System ("NPDES") permits issued by the EPA, or by an EPA-delegated State permitting authority. See Clean Water Act §§ 502(12)(A) and 502(7). In New Hampshire, the NPDES program is administered by the EPA.

### The Parties

The Conservation Law Foundation is a non-profit, member-supported environmental advocacy organization, with approximately 3,350 members, 450 of whom live in New Hampshire. The CLF works to protect the health of New England's water

---

[1]     The Clean Water Act defines a "point source" as "any discernible, confined and discrete conveyance, including, but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants may be discharged." Clean Water Act § 502(14).

resources, and, more specifically, has worked for more than a decade to protect Great Bay, Little Bay, the Piscataqua River and other waters that collectively comprise the Great Bay estuary from pollution associated with growth and development, including stormwater pollution. In 2012, the CLF established the Great Bay-Piscataqua Waterkeeper, a program that is dedicated to restoring and protecting the health of the water bodies that make up the Great Bay estuary.

Defendant Pease Development Authority owns and operates the Pease International Tradeport and Airport, which is a 3,000-acre property with 40 percent of its land in the City of Portsmouth, and 60 percent of its land in the Town of Newington ("Pease International"). The property was previously owned by the federal government, operating as Pease Air Force Base, which closed in 1991. In April of 1989, the New Hampshire Legislature established the Pease Redevelopment Commission to plan for the closure and redevelopment of the Base. The Commission's work led to the creation of the Pease Development Authority on June 1, 1990, by the New Hampshire Legislature, as a "body politic and corporate of the state," "deemed to be a public instrumentality." Compl. ¶ 15 (quoting NH RSA § 12-G:3, I).[2] In

---

[2] New Hampshire RSA § 12-G:3, I, further provides: "the exercise by the authority of the powers conferred by this

1992 and 1997, the United States Air Force transferred its interest in the Pease Air Force Base to the PDA.

The Authority is governed by a board consisting of seven members, who are charged with appointing an Executive Director. See NH RSA 12-G:4. Four members of the Board are appointed by the Governor and legislative leaders. Id. Three members are appointed by the City of Portsmouth and the Town of Newington. Id. The Chairman of the Board is appointed by and serves at the pleasure of New Hampshire's Governor. Id.

## The Stormwater Runoff Permit

Stormwater runoff contains a wide variety of pollutants. It is a major cause of water quality impairment in rivers, lakes, estuaries and coastal areas in New Hampshire and across the United States. Stormwater runoff impacts water quality because it contributes significant amounts of pollution to receiving waters, changes natural hydrologic patterns, accelerates stream flows, destroys aquatic habitat, and elevates pollutant concentrations and loading. Stormwater runoff is a particularly significant source of water pollution in New Hampshire, causing or contributing to 83 percent of water quality impairments documented by the New Hampshire Department

chapter shall be deemed and held to be the performance of public and essential governmental functions of the state."

of Environmental Services.  And, in the Great Bay estuary,
stormwater accounts for the delivery of a substantial amount of
nitrogen (the pollutant of greatest concern to the estuary's
health).  The New Hampshire Department of Environmental Services
and the EPA have identified the reduction of nitrogen and other
pollutants as a top priority for the Great Bay estuary.

CLF's complaint asserts that "PDA is an agency of the State
of New Hampshire with jurisdiction over disposal of sewage,
industrial wastes, stormwater or other wastes."  Compl. ¶ 53.
So, says CLF, it is PDA's responsibility to manage stormwater at
Pease International in compliance with the Clean Water Act.

Pease International generates stormwater runoff from its
streets, roofs, municipal buildings and infrastructure, and
parking lots, which contain a variety of pollutants.  The EPA,
which compiles Waterbody Quality Assessment Reports, has
determined that water quality is being impaired in a number of
the waters into which Pease International directly or indirectly
discharges stormwater.

On August 8, 2000, the EPA issued an NPDES permit to PDA
that authorizes the discharge of wastewater and industrial
stormwater to five different outfalls: the Piscataqua River,
Hodgkins Brook, Flagstone Creek, McIntyre Brook, and Harvey's

Creek (hereafter, the "Industrial Permit"). That permit, which had a term of five years, became effective on September 7, 2000, and expired on September 7, 2005. Since its expiration in 2005, the Industrial Permit has been administratively continued, and is still in effect.

But, according to the CLF, the Authority's Industrial Permit alone is no longer sufficient to maintain PDA's compliant status. Instead, asserts CLF, PDA was also required to obtain a small municipal separate storm sewer system permit. Pursuant to Section 402(p)(6) of the Clean Water Act, operators of small municipal separate storm sewer[3] systems[4] are required to obtain

---

[3] A "municipal separate storm sewer" is defined as a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains) (i) owned or operated by a public body created by or pursuant to State law having jurisdiction over disposal of sewage, industrial wastes, stormwater, or other wastes, (ii) designed or used for collecting or conveying stormwater; (iii) which is not a combined sewer; and (iv) which is not part of a Publically Owned Treatment Works. See Compl. ¶ 24 (citing 40 CFR § 122.26(b)(8)).

[4] "Small municipal separate storm sewer systems" are defined as separate storm sewers that are (i) owned or operated by a public body created by or pursuant to State law having jurisdiction over disposal of sewage, industrial wastes, stormwater or other wastes, and (ii) not defined as large or medium municipal separate storm water sewer systems or designated by the EPA as contributing to a violation of a water quality standard or pollutants to waters of the United States. See Compl. ¶ 25 (citing 40 CFR § 122.26(b)(16).

NPDES permit coverage for their stormwater discharges. In May 2003, the EPA issued a General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems applicable to small municipal separate storm sewer systems in New Hampshire (the "2003 MS4 Permit"). The 2003 MS4 Permit expired on May 1, 2008, but remains in effect until the EPA issues a new permit.[5] The 2003 MS4 Permit imposes certain requirements on small municipal separate storm sewer system operators to, _inter alia_, develop implement and enforce a stormwater management plan that details practices that will be implemented by the operator to reduce the discharge of pollutants from the storm sewer systems to the maximum extent practicable. According to CLF, PDA's existing Industrial Permit fails to impose those requirements.

CLF alleges that PDA owns and operates a small municipal separate storm sewer system at Pease International. More specifically, CLF alleges that Pease International is located in an urbanized area, and owns and operates a system of conveyances discharging pollutants (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-

---

[5] The EPA released a draft new general permit for stormwater discharges from small MS4s, and accepted public comments on that draft until November 20, 2015. In January, 2017, the EPA issued a final 2017 General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems (the "2017 MS4 Permit"), with a July 1, 2018, effective date.

made channels or storm drains), which are (1) designed or used for collecting or conveying stormwater that is not a combined sewer or publically owned treatment works, and (2) owned or operated by a public body created pursuant to state law and having jurisdictional authority over stormwater. Therefore, says CLF, PDA is required to obtain coverage under a small MS4 permit.

Based on the foregoing, the CLF asserts eight violations of the Clean Water Act by PDA, all of which stem from PDA's failure to obtain a small municipal separate storm sewer system permit, and to comply with that permit's additional requirements. CLF asks the court to, inter alia, declare PDA to be in violation of the Clean Water Act for its unpermitted discharge of pollutants into the waters of the United States; order PDA's compliance with all applicable MS4 requirements; and order PDA to pay civil penalties.

## DISCUSSION

The PDA's response falls into three categories. First, PDA argues that, as a state agency, it is immune from suit under the Eleventh Amendment. And, it says, the individual defendants, state officers sued in their official capacity, are immune as well, both from claims for money damages, and from the declaratory and injunctive relief sought by the CLF. Second,

PDA argues it is prohibited from applying for an MS4 permit because: (1) it already has a stormwater permit under the Clean Water Act, and (2) the 2003 MS4 Permit expired in 2008. Therefore, says PDA, CLF lacks standing because its injury (stormwater discharge in the absence of a 2003 MS4 Permit) is not redressable by the Court. Finally, PDA contends, even if CLF has standing, its claims fail as a matter of law.

## The Clean Water Act and Stormwater Regulation

Before examining the substance of the parties' respective positions, some background concerning the Clean Water Act may prove helpful. The Clean Water Act was enacted by Congress in 1972, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Decker v. Northwest Envtl. Def. Ctr., 568 U.S. 597, 602 (2013) (additional citations omitted). "A central provision of the Act is its requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States." Id. (citing 33 U.S.C. §§ 1311(a), 1362(12) (additional citations omitted). "A permit may be granted from the EPA or from the state where the discharger is located, if the state has developed a program and has received permitting authority from the EPA." U.S. Pub.

Interest Research Grp. v. Atl. Salmon of Maine, LLC, 215 F.

Supp.2d 239, 246 (D. Me. 2002) (citing 33 U.S.C. § 1342(a),

(b)).

"NPDES permits come in two varieties: individual and

general." NRDC v. United States E.P.A., 279 F.3d 1180, 1183

(9th Cir. 2002). As the Court of Appeals for the Ninth Circuit

has explained:

> "An individual permit authorizes a specific entity to
> discharge a pollutant in a specific place and is
> issued after an informal agency adjudication process."
> Natural Res. Def. Council, 279 F. 3d at 1183 (citing
> 40 C.F.R. §§ 122.21, 124.1–124.21, 124.51–124.66). A
> general permit, by contrast, is issued for an entire
> class of hypothetical dischargers in a given
> geographical region and is issued pursuant to
> administrative rulemaking procedures. See id. §
> 122.28. Once a general permit has been issued, an
> entity seeking coverage generally must submit a
> "notice of intent" to discharge pursuant to the
> permit. Id. § 122.28(b)(2). The date on which
> coverage commences depends on the terms of the
> particular general permit, such as, inter alia, upon
> receipt of the notice of intent or after a specified
> waiting period. Id. § 122.28(b)(2)(iv). Additionally,
> the permit issuer may require a potential discharger
> to apply for an individual permit. Id. §
> 122.28(b)(3).

Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC, 765

F.3d 1169, 1171 (9th Cir. 2014).

In 1987, Congress added Section 402(p) to the Act, which

requires implementation of a two-phase comprehensive regulatory

program to address stormwater discharge.  Phase I of the program
required NPDES permits for large discharge sources,
specifically: (1) operators of "large" and "medium"
municipalities (those generally serving populations of 100,000
or more): (2) stormwater discharges associated with industrial
activity; (3) certain other discharges designated by state or
EPA officials as causing a violation of water quality standards;
and (4) those entities for which permits had been issued prior
to the enactment date of the amendment.  See Conservation Law
Found. v. Hannaford Bros. Co., 327 F. Supp. 2d 325, 328 (D. Vt.
2004), aff'd sub nom. Conservation Law Found. v. Hannaford
Bros., 139 Fed. Appx. 338 (2d Cir. 2005), (citing 33 U.S.C. §
1342(p)(2)).  Phase II required the EPA to "identify and address
sources of pollution not covered by the Phase I Rule."  Envtl.
Def. Ctr., Inc. v. E.P.A., 344 F.3d 832, 842 (9th Cir. 2003).

     In 1990, the EPA promulgated rules establishing Phase I of
the NPDES stormwater program, setting forth permit application
requirements for those large discharge sources covered by Phase
I.  National Pollutant Discharge Elimination System Permit
Application Regulation for Stormwater Discharges, 55 Fed. Reg.
47,990 (Nov. 16, 1990) (codified at 40 C.F.R. pts. 122–24).  In
December, 1999, EPA promulgated the Phase II rule.  Regulations
for Revision of the Water Pollution Control Program Addressing

Storm Water Discharges, 64 Fed. Reg. 68,722 (Dec. 8, 1999)
(codified at 40 C.F.R. pts. 9, 122, 123 and 124).  Phase II
required NPDES permits for stormwater discharges from regulated
small municipal sewer systems (small MS4s located in "urbanized
areas" as defined by the Bureau of the Census), and small
construction sites.  40 C.F.R. § 122.26(a)(9)(i).

## Eleventh Amendment Immunity

Defendants argue that the Eleventh Amendment bars all
claims against them.  "The Eleventh Amendment provides that the
'Judicial power of the United States shall not be construed to
extend to any suit . . . commenced or prosecuted against one of
the States by citizens of another State, U.S. Const., Amdt. 11,
and [as interpreted] by its own citizens.'"  Lapides v. Bd. of
Regents, 535 U.S. 613, 618 (2002) (quoting Hans v. Louisiana,
134 U.S. 1, 10 (1890)).  "As a general matter, 'states are
immune under the Eleventh Amendment from private suit in the
federal courts.'"  Wojcik v. Mass. State Lottery Comm'n, 300
F.3d 92, 99 (1st Cir. 2002) (quoting Greenless v. Almond, 277
F.3d 601, 606 (1st Cir. 2002)).  That "immunity applies only to
the states themselves and entities that are determined to be
arms of a state."  Pastrana-Torres v. Corporacion De P.R. Para
La Difusion Publica, 460 F.3d 124, 126 (1st Cir. 2006)
(citations omitted).  As the entity asserting immunity, PDA

"bears the burden of showing that it is an arm of the state."

Wojcik, 300 F.3d at 99 (citations omitted).

### A.    PDA as an "Arm of the State"

Our court of appeals has developed a two-step analysis to be used in determining whether an entity is an arm of the state. See Irizarry-Mora v. University of Puerto Rico, 647 F.3d 9, 12 (1st Cir. 2011).  Under that two-step analysis:

> a court must first determine whether the state has indicated an intention — either explicitly by statute or implicitly through the structure of the entity — that the entity share the state's sovereign immunity. If no explicit indication exists, the court must consider the structural indicators of the state's intention. If these point in different directions, the court must proceed to the second stage and consider whether the state's treasury would be at risk in the event of an adverse judgment.

Id. (quoting Redondo Constr. Corp. v. P.R. Highway & Transp. Auth., 357 F.3d 124, 126 (1st Cir. 2004)) (additional citations omitted).

PDA argues that, as "an agency of the State of New Hampshire," compl. ¶ 53, it is entitled to Eleventh Amendment immunity.  In support of that argument, PDA contends that its status is made clear by statutory language creating it, that explicitly declares the PDA to be a "body politic and corporate of the state," and providing that "the exercise by the authority

of the powers conferred by this chapter shall be deemed and held to be <u>the performance and essential governmental functions of the state</u>."  NH RSA 12-G:3, I (emphases added).

PDA also draws support from New Hampshire statutes that govern the State's sovereign immunity, including NH RSA 541-B, which creates a limited waiver of the State's sovereign immunity with respect to tort suits in state court, and includes PDA as a state agency; and NH RSA 99-D, which codifies the State's sovereign immunity, and specifically includes "directors, officers, and employees of the Pease development authority." So, says PDA, because New Hampshire has explicitly indicated its intent that PDA share its sovereign immunity, the structural factors on which CLF focuses its argument do not come into play (although, PDA argues, consideration of those structural factors also supports its entitlement to sovereign immunity).

PDA further argues that the legislative history supports its position, pointing out that the legislation creating the PDA initially described it as a "body politic and corporate having a distinct legal existence separate and apart from the state." Def.'s Reply in Supp. of Mot. to Dismiss at 5 (quoting N.H. Senate Jour., Feb. 1, 1990, p. 236).  However, says PDA, the federal government was unsatisfied by that envisioned structure, and "would not transfer Pease unless the transferee were part of

the State." Id. So, the legislation was amended to make clear
that PDA was a "body politic and corporate of the state." Id.
(citing NH House Journ., Mar. 29, 1990, p. 86).

Plaintiff disagrees that PDA is an "arm of the state."
Relying on Grajales v. P.R. Ports Auth., 831 F.3d 11, 19 (1st
Cir. 2016), CLF takes the position that the PDA is not an "arm
of the state" for sovereign immunity purposes simply because it
has been so designated by the State. Instead, the CLF argues,
the court must consider the PDA's structure and conduct, which,
CLF says, weigh against such a finding. More specifically, CLF
argues that the following factors weigh against PDA being
considered an "arm of the state:" (1) PDA has been vested with
significant autonomy by the legislature; (2) PDA performs
proprietary functions, including acting as a landlord; (3) PDA
is financially independent of the State; and (4) PDA is not
controlled by the state, but by a board of directors and an
executive director. Finally, CLF argues that PDA is not
entitled to sovereign immunity because New Hampshire would not
be liable to pay any judgment against PDA, and this suit poses
no risk to the State of New Hampshire's treasury.

The New Hampshire legislature's intent that PDA share its
sovereign immunity is made clear in several different statutory
provisions. First, NH RSA 12-G:8, XIV, grants PDA the power:

> To procure insurance against any loss in connection
> with its airport or division property or projects in
> such amount . . . as it may deem necessary or
> desirable, and to pay any premiums therefor.  <u>Nothing
> in this paragraph shall be construed as a waiver of
> the sovereign immunity of the state except as
> authorized under RSA 491:8</u>.

<u>Id</u>. (emphasis added).  CLF argues that this provision supports

its own position, because it notes that the state's sovereign

immunity is not affected by PDA's ability to procure insurance,

not that PDA has sovereign immunity.  According to CLF, the

clause suggests that, "PDA's mere operation as a public body

might otherwise waive New Hampshire's (and not PDA's) sovereign

immunity due to its quasi-public/private nature."  Pl.'s

Surreply in Supp. of Obj. to Mot. to Dismiss at 15-16.  But, as

PDA points out, if the legislature believed that PDA and the

state were separate, PDA's purchase of insurance would have no

impact on the state.  Instead, as PDA persuasively argues, the

legislature intended to grant PDA the ability to purchase

insurance without endangering PDA's sovereign immunity

protection.

RSA 99-D:1 and 2 further evidence the state's intent that

PDA share the state's sovereign immunity.  The New Hampshire

legislature codified the state's sovereign immunity in RSA 99-

D:1, which "also adopted official immunity for state and state

agency officers, trustees, officials and employees."  <u>Everitt v.</u>

Gen. Elec. Co., 156 N.H. 202, 209-210 (2007).  That statute

provides, in part:

> The doctrine of sovereign immunity of the state, and
> by the extension of that doctrine, the official
> immunity of officers, trustees, officials, or
> employees of the state or any agency thereof acting
> within the scope of official duty and not in a wanton
> or reckless manner, except as otherwise expressly
> provided by statute, is hereby adopted as the law of
> the state.

RSA 99-D:1.  RSA 99-D:2 goes on to define circumstances under

which state employees would be entitled to a defense and

indemnification provided by the state.  Explicitly included

within RSA 99-D:2's list of state employees entitled to a

defense and indemnification under the statute are "directors,

officers and employees of the Pease development authority." RSA

99-D:2 (emphasis added).

Finally, the legislature included PDA in the state's

limited waiver of its sovereign immunity in RSA 541-B:1.  RSA

541-B sets forth comprehensive procedures and guidelines for

bringing claims that would otherwise be barred by sovereign

immunity, against the state, its agencies and employees.  See

generally RSA 541-B:1, et seq.  "Agency" is defined by the

statute as:

> all departments, boards, offices, commissions,
> institutions, other instrumentalities of state

> government, including but not limited to the <u>Pease</u>
> <u>development authority</u>, division of ports and harbors,
> the New Hampshire housing finance authority, the New
> Hampshire housing finance authority, the New Hampshire
> energy authority, the community college system of New
> Hampshire, and the <u>Pease development authority</u>, and
> the general court, including any official or employee
> of same when acting in the scope of his or her elected
> or appointed capacity, but excluding political
> subdivisions of the state.

RSA 541-B:1(I) (emphasis added). CLF fails to provide an

adequate explanation as to why the state would (twice) designate

PDA as an agency waiving sovereign immunity for certain claims

if the PDA was not otherwise entitled to sovereign immunity.

CLF pays those statutes scant attention, arguing only that

they are inapplicable to this suit. CLF does not explain why

that might be the case, and, indeed, its reasoning logic in that

regard is difficult to discern. But, even if the court were to

ignore the state's clear expressions of intent that PDA share

the state's sovereign immunity, consideration of structural

indicators of the state's intent further establishes PDA's

status as an arm of the state. <u>See</u> Defs.' Reply in Supp. of

Mot. to Dismiss at pp. 5-15. Accordingly, for the reasons given

in PDA's briefing as well as those given here, the court finds

that PDA is a state agency for Eleventh Amendment purposes.

**B.   Claims against PDA Officers and Directors**

PDA argues that CLF's claims against the individual defendants are also barred by the Eleventh Amendment.

The Eleventh Amendment applies "whether the named defendant is the state itself," or "a state official in her official capacity." Davidson v. Howe, 749 F.3d 21, 27 (1st Cir. 2014). Thus, claims against state officials for damages in their official capacities are barred by the Eleventh Amendment. Redondo–Borges v. United States HUD, 421 F.3d 1, 7 (1st Cir. 2005). However, the doctrine of Ex parte Young, 209 U.S. 123 (1908), "permits suit against a state official to obtain a declaratory judgment for prospective relief to enforce a federal right." Wilson v. Brock, No. CIV. 01-284-JD, 2002 WL 1676287, at *5 (D.N.H. July 18, 2002) (citations omitted). In other words, "an Ex parte Young plaintiff may obtain prospective, but not retrospective, relief." Greenless, 277 F.3d at 607. The Ex parte Young exception to the Eleventh Amendment is intended "to prevent continuing violations of federal law, but not to remedy past violations." Id.

As the Supreme Court noted in Papasan v. Allain, 478 U.S. 265, 278 (1986):

Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant. This is true if the relief is expressly denominated as damages. See, e.g., Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459 (1945). It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else. See, e.g., Green v. Mansour, 474 U.S. 64, at 69-70 (1985), Edelman v. Jordan, 415 U.S. 651, 664-668 (1974). On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury. See Milliken v. Bradley, 433 U.S. 267, 289-290 (1977); Edelman, supra 415 U.S. at 667-668.

To the extent that CLF is seeking retrospective relief for PDA's purported past violations of the Clean Water Act, PDA is correct - such relief falls outside the Ex parte Young exception to state sovereign immunity. See, e.g., National Resources Defense Council v. California DOT, 96 F.3d 420, 423 (9th Cir. 1996) (upholding district court's dismissal of all claims against state official on Eleventh Amendment grounds "for civil penalties and declaratory relief pertaining to past violations of the Clean Water Act."); see also Swartz v. Beach, 229 F. Supp. 2d 1239, 1252 (D. Wyo. 2002) ("To the extent Plaintiff seeks monetary damages against the State Defendants in their official capacities for past violations of the CWA, the claim is barred by the Eleventh Amendment.")

However, CLF's complaint makes clear that it is also
seeking: (1) a declaration that PDA is violating the Clean Water
Act; and (2) an order enjoining PDA from continuing to violate
the Clean Water Act and requiring it to comply with the Act's
mandates.  Such prospective relief falls squarely within Ex
parte Young's scope, as it purports only to remedy continuing
violations of federal law.  See Caesars Mass. Dev. Co., LLC v.
Crosby, No. CIV.A. 13-13144-NMG, 2014 WL 2468689, at *7 (D.
Mass. May 30, 2014), aff'd sub nom. Caesars Mass. Mgmt. Co., LLC
v. Crosby, 778 F.3d 327 (1st Cir. 2015) ("the 'pivotal question'
in deciding the prospective or retrospective character of the
requested relief is 'whether the requested relief would directly
bring an end to an ongoing violation of federal law.'") (quoting
Hootstein v. Collins, 670 F. Supp. 2d 110, 114 (D. Mass. 2009))
(additional citations omitted).  PDA does not, and cannot
seriously, dispute that such relief is permissible under Ex
parte Young.  See Defs.' Mem. in Supp. of Mot. to Dismiss at 15.

Instead, PDA takes the position that such relief is not
authorized by Ex parte Young, because: (1) when a statute
affords a state official a choice in how to carry out an
overarching legal mandate, that official cannot be forced to
choose one particular manner; (2) CLF fails to allege an ongoing

violation of federal law; and (3) CLF's claims are barred under
Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997).

    (1)  Discretionary Act

        PDA first argues that, pursuant to the regulations at issue
here, the decision to continue coverage under an individual
permit (as PDA says it has done with its Industrial Permit), or
seek permission from the EPA to revoke that individual permit
and be covered under a general permit, is a discretionary matter
left to the permittee.  And, because that decision has been left
to the permittee, PDA argues, Ex parte Young cannot be used to
force PDA to exercise its discretion to choose an MS4 Permit
instead.

        The regulations upon which both parties rely are far from
clear on this particular issue, but the weight of authority
supports CLF's position that the Clean Water Act requires
separate permits for industrial and municipal stormwater
discharges.

        As previously discussed, the Clean Water Act regulates
stormwater discharges from three potential sources: municipal
separate storm sewer systems, construction activities, and
industrial activities.  PDA's position collapses different
permitting schemes, serving discrete purposes, into one.  That

it has an individual permit for one source (and type) of
stormwater discharge (industrial), does not relieve PDA from its
obligation to obtain a permit for stormwater discharges of a
different type and from a different source (municipal).  (PDA
concedes that it has applied, separately, for coverage under the
general permit for construction stormwater discharges.  <u>See</u>
Def.'s Reply in Supp. of Mot. to Dismiss at 16.)

Applicable regulations impose distinct permitting
requirements for industrial[6] and municipal stormwater discharges.
For example, as part of the permitting process, a regulated
small MS4 operator must provide to the permitting authority: (1)
its chosen best management practices for each of the six minimum
control measures ((i) public education and outreach on
stormwater impacts; (ii) public participation and involvement;
(iii) illicit discharge detection and elimination;
(iv)construction site runoff control; (v) post-construction
stormwater management; and (vi) pollution prevention/good
housekeeping); (2) measurable goals for each minimum control
measure; and (3) estimated months and years in which actions to

---

[6]     The regulations define "[s]torm water discharge associated
with industrial activity" to mean "the discharge from any
conveyance that is used for collecting and conveying storm water
and that is directly related to manufacturing, processing or raw
materials storage areas at an industrial plant." 40 C.F.R. §
122.26(b)(14).

implement each measure will be undertaken.  See 40 C.F.R. §

122.34.  In contrast, an applicant for stormwater discharges

associated with industrial activity must provide, inter alia, a

site map, information regarding leaks or spills of toxic or

hazardous pollutants at the facility that have taken place

within the three years prior to submittal of the application,

and significant sampling data.  See 40 C.F.R. § 122.26(c)(1)(i).

The EPA's imposition of different permitting requirements upon

these different sources of stormwater discharges gives rise to

an inference that the two sources invoke different environmental

concerns, requiring separate monitoring and management efforts.


    The EPA's Final Rule accompanying the Small MS4 regulation

does not directly address the issue.  However, it does state:

"The existing NPDES storm water program already regulates storm

water from federally or State-operated industrial sources.

Federal or State facilities that are currently regulated due to

their industrial discharges may already be implementing some of

today's rule requirements."  Regulations for Revision of the

Water Pollution Control Program Addressing Storm Water

Discharges, 64 Fed. Reg. 68,722 (Dec. 8, 1999) (codified at 40

C.F.R. pts. 9, 122, 123 and 124).  That language suggests that

those federal and state facilities "already implementing" some

of the new requirements under existing industrial permits are
not excused from also implementing "today's rule requirements."

Further support is found in guidance issued by the EPA to
municipalities that are also engaged in industrial activities.
An article entitled "Industrial Activities Owned or Operated by
a Municipality in New England" includes the following
instruction:

> With the exception of power plants, airports, and
> uncontrolled sanitary landfills, storm water
> discharges associated with specific industrial
> activities at facilities owned or operated by
> municipalities with populations of less than 100,000
> were temporarily exempted from the need to obtain
> coverage under an NPDES industrial storm water permit.
> Under the provisions of the NPDES Storm Water Program
> Phase II Final Rule, these industrial facilities now
> require permit coverage as of March 10, 2003. Unless
> excluded from the category definitions under
> 122.26(b)(14), operators of industrial facilities or
> sites with activities included in one of 11 categories
> must obtain coverage under an NPDES industrial storm
> water permit. A description of these categories is
> provided in EPA's document entitled "Who is subject to
> Phase I the NPDES Storm Water Program and needs a
> Permit?" These permit requirements are separate, and
> are in addition to, the requirement for designated
> municipalities to obtain coverage for their storm
> water discharges under the General Permit for Storm
> Water Discharges from Regulated Small Municipal
> Separate Storm Sewer Systems (MS4s) (a.k.a. the Phase
> II or MS4 Permit).

U.S. Envtl. Protection Agency, Industrial Activities Owned or
Operated by a Municipality in New England (updated August 10,
2017), available at https://www.epa.gov/npdes-

permits/industrial-activities-owned-or-operated-municipality-new-england (last visited Sept. 14, 2017) (emphasis added).

Separate permits are, then, required for industrial and MS4 stormwater discharges. The 2003 MS4 Permit expressly states that stormwater discharges associated with industrial activity and construction activity, as defined by the regulations, are not authorized by the permit. See 2003 MS4 Permit Part I.V.2(b)-(c). That also supports the conclusion that a separate permit for stormwater discharges associated with each source (municipal, industrial and construction activities) is required.

In Puget Soundkeeper All. v. Cruise Terminals of Am., LLC, 216 F. Supp. 3d 1198, 1207-08 (W.D. Wash. 2015), the court addressed the reverse of the argument made by PDA here. In that case, plaintiff alleged that defendant was discharging industrial stormwater runoff without the required industrial discharge permit. Defendant there argued that the runoff was already covered by its municipal stormwater permit. The court reached the same result - both permits are required:

> The Court agrees that the Municipal Permit may not be adequate for the discharges to the municipal separate sewer system. The Municipal Permit itself states that a separate NPDES permit is required for facilities that create stormwater discharges associated with industrial activity. . . . In a Final Rule implementing the NPDES regulations, EPA similarly

clarified that "discharges through a municipal storm
sewer need to be covered by an NPDES permit that is
independent of the permit issued for discharges from
the municipal separate storm sewer system." <u>National
Pollutant Discharge Elimination System Permit
Application Regulations for Storm Water Discharges</u>, 55
Fed. Reg. 47990, 47995 (November 16, 1990).

<u>Id</u>. At issue in that case was the Phase I MS4 permit. That
distinction was not critical to the court's determination that a
separate NPDES permit was required for municipal and industrial
stormwater discharges. Similarly, in <u>Kleinman v. City of
Austin</u>, No. 1:15-CV-497-RP, 2017 WL 3585792, at *5 (W.D. Tex.
Aug. 18, 2017), the court found that an MS4 stormwater discharge
permit did not cover stormwater discharges from construction
activity, and that the defendant's reliance upon its MS4
discharge permit was misplaced.

    In sum, because PDA's argument is focused on the
distinction between individual and general permits, not the
distinction between industrial permits and small MS4 permits, it
is misguided. To be sure, under 40 C.F.R. § 122.28(b)(4), an
individual permit holder has the discretion to request that its
individual permit be revoked, and that it be covered instead by
a general permit. But that discretion belongs to an individual
small MS4 permittee who seeks instead to be covered by a general
small MS4 permit. In other words, PDA's argument that it cannot
be required to obtain a <u>general</u> MS4 permit because it has chosen

instead to be covered by an <u>individual</u> (Industrial) permit is a
bit of a red herring.  PDA does not have an <u>individual</u> small <u>MS4</u>
<u>permit</u>.

PDA does not have discretion to choose between applying for
an industrial stormwater discharge permit <u>or</u> a small MS4
stormwater discharge permit.  If PDA does, in fact, qualify as
an operator of an industrial facility under the regulations, <u>and</u>
as an operator of a regulated small municipal separate storm
sewer system, PDA is required to secure permit coverage to
discharge both its industrial and its municipal stormwater.

Obtaining a municipal stormwater permit under the Clean
Water Act is not a matter committed to PDA's discretion.

(2)  <u>Ongoing Violation of Federal Law</u>

Defendant next argues that CLF's claims for injunctive
relief all arise out of PDA's purported failure to obtain
coverage under the 2003 MS4 Permit. But, PDA says, that 2003 MS4
Permit expired after five years, on May 1, 2008.  Once the 2003
MS4 Permit expired, no one, including PDA, could seek coverage
under the permit.  So, PDA argues, even if the court were to
conclude that PDA's failure to secure coverage under the 2003
MS4 Permit violated the CWA, there is "nothing to 'prospectively

enjoin' because there is no general permit in place to secure."
Def.'s Mem. in Supp. of Mot. to Dismiss at 20.

PDA's argument rests upon a misunderstanding of the
majority of CLF's claims.  PDA is likely correct with respect to
CLF's claim that PDA violated the Clean Water Act by failing to
submit a Notice of Intent to be covered under the 2003 MS4
Permit (Count III) prior to its expiration in 2008.  That claim
can only be characterized as a past violation.  See Caesars
Mass. Dev. Co., LLC v. Crosby, 2014 WL 2468689, at *7 (finding
Gaming Commission's determination that plaintiff was not a
suitable applicant did not constitute a "continuing violation of
federal law but, rather, at most a past violation the record of
which continues to be available and have ongoing effects. . . .
In light of the allegation that the suitability investigation
was conducted unconstitutionally, plaintiff's requested relief
cannot ensure future compliance with a substantive legal
question.").

However, the majority of CLF's claims are not so narrow.
CLF more broadly asserts that PDA is currently violating the
Clean Water Act in an ongoing manner by continually discharging
water without complying with the Act's permitting requirements
for small municipalities, and by discharging municipal
stormwater into the waters of the United States without the

necessary permit.[7]  See, e.g., Compl. Count I, Count II.  CLF has

sufficiently alleged an ongoing violation of federal law for Ex

parte Young purposes at this stage of the litigation.  Cf., Carr

v. Alta Verde Indus., Inc., 931 F.2d 1055, 1063 (5th Cir. 1991)

(addressing standing requirement for citizen suit under the

Clean Water Act that plaintiffs allege a "continuous or

intermittent violation," and finding that a discharger operating

without a permit "remains in a continuing state of violation

until it either obtains a permit or no longer meets the

definition of a point source.").


   (3)  Core Sovereignty Interests

     Finally, PDA argues that CLF's claims are barred under

Idaho v. Coeur d'Alene Tribe, a case in which the Supreme Court

created an exception to Ex parte Young when a suit for

prospective relief from an ongoing violation of federal law

"implicates special sovereignty interests."  521 U.S. at 307.

PDA contends that "special sovereignty interests" exist here, as

the New Hampshire Legislature has recognized that it is "in the

public interest and to be the policy of the state to foster and

promote the redevelopment of Pease Air Force Base."  Def.'s Mem.

in Supp. of Mot. to Dismiss at 23 (quoting NH RSA 12-G:1, II).

---

[7]   As PDA points out, and as addressed herein, several of
CLF's claims are duplicative.

Subjecting PDA's redevelopment efforts to some of the small MS4 stormwater permitting requirements (such as implementation of controls on new development and construction, as well as "smart growth" provisions) could result in "significant potential brakes on economic development," PDA argues. Id. at 24. So, PDA contends, CLF is seeking to require PDA to adopt regulations, ordinances and rules that are decidedly inconsistent with what New Hampshire had determined to be in its interest, i.e. the "speedy and proper redevelopment" of the Pease Air Force Base. Id. at 25. Because redevelopment of Pease implicates New Hampshire's sovereign interest in its use and regulation of its land, as well as the state's authority to protect its citizens from "economic catastrophe," id. at 26, PDA argues that Ex parte Young does not apply under the Coeur D'Alene Tribe rule.

Coeur D'Alene does not apply to the facts of this case. Its application is plainly limited to "egregious" situations in which the relief requested would completely divest the state of sovereign control over its land. Pl.'s Mem. in Supp. of Obj. to Mot. to Dismiss at 38. The relief CFL seeks does not threaten New Hampshire's sovereignty. New Hampshire will have no lesser claim of title or regulatory control over PDA's land than it had before.

In Coeur D'Alene Tribe, the tribe filed suit against Idaho state officials, arguing an interest under federal law to the banks, beds and submerged lands of Lake Coeur d'Alene, and the rivers and streams forming its waterway. 521 U.S. at 264-65. The court found that the Tribe's action was not permitted by Ex parte Young. Id. at 281. "Because of the historical and legal importance of submerged lands to state sovereignty, the Court held that 'if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury.'" Lacano Investments, LLC v. Balash, 765 F.3d 1068, 1073 (9th Cir. 2014) (quoting Coeur d'Alene, 521 U.S. at 287-88). Because the Tribe sought to "divest the State of all regulatory power over submerged land — in effect to invoke a federal court's jurisdiction to quiet title to sovereign lands — it simply cannot be said that the suit is not a suit against the State." Coeur d'Alene, 521 U.S. at 296 (O'Connor, J., concurring). "Thus, '[t]he dignity and status of its statehood allow[ed] Idaho to rely on its Eleventh Amendment immunity,' and the Court ordered the Tribe's action dismissed." Lacano Investments, 765 F.3d at 1073 (quoting Coeur d'Alene, 521 U.S. at 287-88).

While our court of appeals has not directly considered what types of action might implicate the "special sovereignty interests" of a state, in Neo Gen Screening, Inc. v. New England Newborn Screening Program, the court seemed to limit Coeur d'Alene's application to circumstances involving transfers of property. 187 F.3d 24, 28 (1st Cir. 1999) ("It is quite true that Ex Parte Young avoids the Eleventh Amendment defense where prospective injunctive relief, not involving damages or property transfer, is sought against named state officials for a violation of federal law.") (citing Coeur d'Alene, 521 U.S. at 276–77) (emphasis added). And, the majority of courts that have directly addressed the issue have defined a state's "special sovereignty interests" quite narrowly. See Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, 17A Fed. Prac. & Proc. Juris. § 4232 (3d ed.) ("Lower courts have been reluctant to use the special state sovereignty interest rationale to limit Ex Parte Young relief.") (collecting cases).

While not directly on point, Clean Air Council v. Mallory, 226 F. Supp. 2d 705 (E.D. Pa. 2002), is nevertheless instructive. In that case, an environmental organization sought to enforce certain Clear Air Act requirements arising out of the state's failure to implement the motor vehicle inspection and maintenance program required by the state's EPA-approved

implementation plan.  The defendants in that case argued that

the state had a "special sovereignty interest" in the design of

its vehicle inspection and maintenance program, and "enforcing

(or not enforcing) state regulations."  Id. at 717.  The court

found that argument unpersuasive, noting: "[t]he discrete

remedial action sought by plaintiff in this case –

implementation of the final emission cutpoints contained within

the EPA-approved Pennsylvania [state implementation plan] – does

not amount to the type of expansive and permanent intrusion on

sovereignty interests sought by plaintiffs in Coeur d'Alene."

Id.

     CLF's complaint makes clear that it is not seeking to

divest the State's interests in Pease International or impede

its regulatory control.  CLF simply wants PDA to abide by the

Clean Water Act's small MS4 permitting requirements.  Therefore,

the relief requested does not implicate "special sovereignty

interests" similar to those in Coeur d'Alene.  See Rhode Island

Res. Recovery Corp. v. Rhode Island Dep't of Environmental

Mgmt., No. CA 05-4151 ML, 2006 WL 2128904, at *5 (D.R.I. July

26, 2006) ("It is clear from its prayer for relief that

[plaintiff] does not seek to remove the Superfund Site from all

state authority or control.  For that reason, the 'special

sovereignty interests' implicated in the Coeur d'Alene decision

are not invoked, 521 U.S. at 281–82, and the Ex parte Young
exception to sovereign immunity functions normally.")

Along similar lines, PDA argues that imposition of the MS4
regime would require the state to pass certain ordinances and
regulations to accomplish a federal mandate, which, says PDA,
would create "grave Tenth Amendment concerns."  Def.'s Mem. in
Supp. of Mot. to Dismiss at 27.

PDA concedes that the two circuit courts of appeal to have
addressed the issue have concluded that the MS4 regulations at
issue do not violate the Tenth Amendment.  See Envtl. Def. Ctr.,
Inc. v. EPA, 344 F.3d at 847–48; City of Abilene v. United
States EPA, 325 F.3d 657, 663 (5th Cir. 2003).  In Envtl. Def.
Ctr., Inc. v. EPA, 344 F.3d at 847, the Court of Appeals for the
Ninth Circuit noted that the small MS4 regulations give
operators "a choice: either implement the regulatory program
spelled out by the Minimum Measures described at 40 C.F.R. §
122.34(b), or pursue the Alternative Permit option and seek a
permit under the Phase I Rule as described at 40 C.F.R. §
122.26(d)."  Thus, the court concluded, the "Phase II Rule does
not violate the Tenth Amendment."  Id.  The court went on to
observe:

Pursuing a permit under the Alternative Permit
option does require permit seekers, in their
application for a permit to discharge, to propose
management programs that address substantive concerns
similar to those addressed by the Minimum Measures.
See 40 C.F.R. § 122.26(d).  However, § 122.26(d) lists
the requirements for an application for a permit to
discharge, not the requirements of the permit itself.
Therefore, nothing in § 122.26(d) requires the
operator of an MS4 to implement a federal regulatory
program in order to receive a permit to discharge,
because nothing in § 122.26(d) specifies the contents
of the permit that will result from the application
process.

Id.


Similarly, in City of Abilene v. EPA, 325 F.3d 657, the

Court of Appeals for the Fifth Circuit stated:


Even assuming arguendo that the Cities'
storm water discharge permits require them to
implement a federal regulatory program, the
Cities cannot establish a Tenth Amendment
violation without demonstrating that they had no
other option but to regulate according to federal
standards.  Here, the Cities were offered a
choice between the permits at issue, which
require implementation of the challenged
management programs, and the numeric end-of-pipe
permits, which would have required compliance
with rigid effluent limitations.  The Cities
chose the former.  Thus, the Cities' Tenth
Amendment challenge fails unless the alternative
numeric end-of-pipe permits presented by the EPA
would also have exceeded the Federal Government's
authority under the Constitution

Id. at 662–63.  The Fifth Circuit then concluded that because

"the Cities voluntarily chose the management permits over

permits that did not require the Cities to regulate according to

federal standards, the Cities have not been compelled to
implement a federal regulatory scheme.  Accordingly, their Tenth
Amendment challenge fails."  Id. at 663.  While not binding,
Envtl. Def. Ctr. and City of Abilene v. EPA provide persuasive,
well-reasoned analysis supporting the court's conclusion that
the small MS4 requirements do not violate the Tenth Amendment.

PDA persists, however, suggesting that this action is
distinguishable from both Envtl. Def. Ctr. and City of Abilene
v. EPA because here, CLF seeks to require PDA to obtain coverage
under the 2003 MS4 Permit, which would not allow PDA the option
of applying for an Alternative Permit instead.  As previously
discussed, however, PDA misinterprets CLF's complaint.  CLF is
not simply challenging PDA's failure to obtain the 2003 MS4
Permit, but rather PDA's continuing failure to comply with the
Clean Water Act's small MS4 permitting requirements.

In sum, to the extent CLF is seeking civil penalties
against PDA, and claiming that PDA violated the CWA by its
failure to submit an NOI to be covered by the 2003 MS4 Permit
(Prayers for Relief (e), (f); Claim III), such relief and claims
are barred by the Eleventh Amendment.  However, CLF's remaining
claims seeking prospective equitable relief fall within the Ex
parte Young exception to the Eleventh Amendment.

## STANDING

PDA next argues that CLF's claims must be dismissed for lack of standing. That is because, PDA contends, CLF's allegations are insufficient to establish injury, or that its members' purported injuries were caused by the alleged Clean Water Act violations. PDA further contends that, even if CLF had adequately alleged injury or causation, CLF lacks standing because the court cannot redress CLF's alleged injuries.

Injury-in-Fact. Our court of appeals has recognized that the injury-in-fact component of the constitutional standing analysis "may be satisfied by environmental or aesthetic injuries." Dubois v. United States Dept. of Agric., 102 F.3d 1273, 1281 (1st Cir. 1996) (citing United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 686 (1973)); Sierra Club v. Morton, 405 U.S. 727, 734 (1972)). Further, the injury alleged "need not be 'significant'; a 'small' stake in the outcome will suffice if it is 'direct.'" Dubois, 102 F.3d at 1281. The Supreme Court has held "that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are 'persons for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183,

(2000) (quoting <u>Sierra Club v. Morton</u>, 405 U.S. at 735, and citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 562–63 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.")).

PDA argues that, without supporting affidavits detailing how its members were injured, CLF cannot establish injury. <u>See</u> Def.'s Mem. in Supp. of Mot. to Dismiss at 29. In response, and in support of its opposition to PDA's motion to dismiss, CLF submitted declarations from two of its members: Helen Frink, co-owner of a family farm located near Pease International, who uses Little Bay and the Piscataqua River for recreational purposes and has consumed fish from its waters; and Mitchell Kalter, a New Hampshire Seacoast resident who is a longtime user of the Great Bay estuary for recreational purposes. <u>See</u> Pl.'s Opp. to Mot. to Dismiss, Exhs. A and B. Both Frink and Kalter express concerns regarding increased pollution of the waters of the Great Bay estuary, and aver that the pollution has adversely affected their use and enjoyment of the estuary. Frink and Kalter both say that potential pollution from Pease International will impact their future enjoyment of the waters, and that their use and enjoyment of the estuary would be enhanced were the waters less polluted.

Those declarations sufficiently establish that Frink and Kalter, as CLF members, have suffered actual injury. See Conservation Law Found., Inc. v. Cont'l. Paving, Inc., No. 16-CV-339-JL, 2016 WL 7116019, at *4 (D.N.H. Dec. 6, 2016); see also Conservation Law Found., Inc. v. Plourde Sand & Gravel Co., No. 13-CV-214-SM, 2014 WL 5781457, at *7 (D.N.H. Nov. 6, 2014). Consequently, CLF has satisfied the "injury-in-fact" requirement of Article III standing.

Causation. PDA argues that CLF has not sufficiently alleged that its members were exposed to more pollutants, or pollutants of a different quality, because of PDA's purportedly unlawful activity. The court addressed a nearly identical argument in Conservation Law Found., Inc. v. Plourde Sand & Gravel Co., 2014 WL 5781457, at *7-8:

> A plaintiff alleging permitting violations under the CWA . . . is not required to demonstrate, or even allege, that the defendant's discharge of pollutants would be any less had it obtained a permit in order to sufficiently allege standing, or even state a claim under the CWA. See Dubois, 102 F.3d at 1281–83, 1296. In Dubois, the court recognized that the "most important component of the [Clean Water Act] is the requirement that an NPDES permit be obtained" before discharging pollutants from any point source into waters of the United States. Id. at 1294, 1296. That interpretation is confirmed by the Supreme Court and the statutory language itself. See 33 U.S.C. § 1342(p) (requiring a permit for "discharge associated with industrial activity"); Laidlaw, 528 U.S. at 174 (stating "Noncompliance with a permit constitutes a violation of the [Clean Water Act]").

In this case, brought under the CWA, CLF alleges that
Plourde's discharge of any storm water associated with
industrial activity and pollutants is illegal activity
because Plourde is required to obtain a permit to
discharge any amount.  . . .  Since CLF has adequately
alleged that Plourde is, without the requisite permit,
discharging pollutants from point sources, including
site grading, surface water channels, subsurface
hydrological connections, and detention ponds, into
waters of the United States, and that the unlawful
discharges have caused it and its members harm, CLF
has also sufficiently alleged, at least at the
pleading stage, that its injury is "fairly traceable"
to Plourde's allegedly illegal conduct.

Id. at *8.  So too, here.  Nothing more need be said at this
stage of the litigation.

Redressability.  Moving to PDA's redressability argument,
PDA contends that the requested injunctive relief will not
redress CLF's alleged injuries.  That is because, PDA says,
CLF's requested injunction requiring PDA to comply with the 2003
MS4 Permit will not redress any injuries already suffered.

The court has largely resolved PDA's contentions regarding
the ongoing effect of its purported violations of the CWA.  As
stated supra, PDA's argument in that regard generally rests on a
misunderstanding of the majority of CLF's claims, which
challenge PDA's ongoing discharge of stormwater associated with
municipal activity without having first obtained the requisite
permit, and not merely PDA's past failure to file an NOI for the
2003 MS4 Permit.

PDA next argues that an injunction would not prevent future injuries because, if the court ordered PDA to comply with the MS4 regulations, the only way that PDA could secure coverage under the MS4 regime would be to file a Notice of Intent with EPA to request coverage under the 2003 MS4 Permit. But, PDA says, EPA would necessarily deny that coverage because (1) EPA cannot authorize coverage under a general permit to an entity like PDA that holds an individual permit; and (2) EPA cannot authorize discharges under an MS4 Permit because there is currently no effective MS4 Permit (because the 2003 MS4 Permit expired in 2008). Therefore, PDA says, CLF's requested equitable relief is unattainable, and the injuries complained of (discharge without a permit) are not redressable.

PDA's argument is unpersuasive because it is not consistent with the relevant regulatory scheme. Pursuant to 40 C.F.R. § 122.33(b), an operator of any regulated small MS4 must seek authorization to discharge under a general or individual NPDES permit, as follows: (1) through a Small MS4 general permit; (2) through an individual NPDES permit meeting the requirements of 40 C.F.R. § 122.34(b)(1)-(6); or (3) through an individual NPDES permit that meets the requirements for large and medium municipal separate storm sewer systems pursuant to 40 C.F.R. § 122.33(b)(2)(ii). PDA is seemingly correct that it cannot now

secure coverage under the general 2003 MS4 Permit.  But, PDA

offers no explanation as to why it cannot secure MS4 permit

coverage by applying for an individual NPDES permit, or by

submitting an NOI to be covered under the general 2017 MS4

Permit, or, for that matter, by pursuing an alternative permit

pursuant to 40 C.F.R. § 122.33(b)(2)(ii).


     To satisfy redressability, plaintiffs must show "a

likelihood that the requested relief will redress the alleged

injury."  Steel Co. v. Citizens for a Better Environment, 523

U.S. 83, 103 (1998).  Here, CLF has complained of harm to the

quality of the waters of the Great Bay estuary resulting from

PDA's purported failure to obtain a permit for its municipal

stormwater discharges.  Should PDA be required to obtain a small

MS4 permit for those discharges and comply with that permit's

terms, as is likely, those discharges (and, consequently,

pollution in the Great Bay estuary) will presumably decrease or

at least be monitored and amenable to future controls.

Accordingly, the court finds that CLF has adequately alleged

that their members' injuries are "likely to be redressed by a

favorable decision" in this action.  Valley Forge Christian

Coll. v. Americans United for Separation of Church & State,

Inc., 454 U.S. 464, 472 (1982).

In sum, CLF's allegations that CLF is discharging municipal stormwater into waters of the United States, including the waters of the Great Bay estuary, without having first obtained the requisite permit, and without complying with regulatory requirements, and that those illegal discharges result in harm to at least two of its identified members, are sufficient, at this stage, to confer standing.

### Failure on the Merits

PDA makes three arguments in support of its position that the Court should dismiss CLF's claims on the merits under Fed. R. Civ. P. 12(b)(6). First, PDA argues, it did not violate the CWA by not seeking coverage under the 2003 MS4 Permit because: (1) the CWA does not allow individual permittees (like PDA) to be covered by a general permit; and (2) the 2003 MS4 Permit has been expired since 2008, and PDA was therefore precluded from seeking coverage since that time. The court has addressed both of those arguments supra, and, for the reasons given, neither argument is persuasive.

Second, PDA argues that its stormwater discharges cannot violate the CWA as a matter of law because it always had a permit for those discharges. PDA points out that, at the time of the permit's issuance, an industrial stormwater permit was the only existing regulatory mechanism for regulating discharges

from entities like PDA that were not covered by any of the other "Phase I" categories (like large and medium MS4s). So, although PDA applied for an industrial stormwater permit, PDA was actually applying for authorization to discharge what CLF now labels "municipal" stormwater.

Therefore, PDA argues, its individual Industrial Permit comprehensively covers its stormwater discharges, "including what is now called municipal stormwater and stormwater from industrial activities, before the 2003 Small MS4 Permit even existed." Pl.'s Reply in Supp. of Mot. to Dismiss at 16. And, because its existing permit covers all stormwater discharges from Pease International, PDA says, its discharges were in compliance with the Clean Water Act. In other words, PDA contends, "PDA's permit allowed it to discharge stormwater from the entire site through Outfalls 001-004 and continuing to do so cannot result in a violation." Id. at 18.

"Although the statute authorizes the court to enforce the Clean Water Act against violators, it also provides — in the so-called shield provision — that compliance with an effective permit is compliance with the statute." U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, 339 F.3d 23, 29 (1st Cir. 2003) (citing 33 U.S.C. § 1342(k)) (additional citations omitted). That provision is set out in Section 402(k) of the

Clean Water Act, 33 U.S.C. § 1342(k), "which defines compliance
with a NPDES . . . permit as compliance with Section 301 for the
purposes of the CWA's enforcement provisions." Atl. States
Legal Found., Inc. v. Eastman Kodak Co., 12 F.3d 353, 357 (2d
Cir. 1993), as amended (Feb. 3, 1994). In another words, while
the Clean Water Act prohibits the discharge of any pollutant
into the waters of the United States, an "NPDES permit sets out
the allowable departures from the CWA's baseline of total
liability for discharges of effluent." Piney Run Assn. v.
County Comm'rs, 268 F.3d 255, 266 (4th Cir. 2001) (citation
omitted). "Assuming that [permit holders] follow the terms of
their NPDES permits, . . . permit holders avoid CWA liability."
Id. at 265.

   "The purpose of the [permit] shield is 'to insulate permit
holders from changes in various regulations during the period of
a permit and to relieve them of having to litigate in an
enforcement action the question whether their permits are
sufficiently strict.'" Sierra Club v. ICG Hazard, LLC, 781 F.3d
281, 285 (6th Cir. 2015) (quoting E.I. du Pont de Nemours & Co.
v. Train, 430 U.S. 112, 138 n. 28 (1977)). Courts interpreting
the defense have held that a permittee will be shielded from
liability under the Clean Water Act, if: (1) it complies with
its existing permit's terms; and (2) only discharges pollutants

disclosed to the permitting agency and within the "reasonable
contemplation" of the Agency during the permitting process.
Piney Run, 268 F.3d at 259.

CLF argues that PDA's municipal discharges and operations
are not addressed under PDA's Industrial Permit (which focuses
on industrial activity), and were not intended to be covered
under that permit because: (1) the permitting program for small
MS4s did not exist at the time of PDA's industrial permit
application; and (2) PDA's development of Pease International
into an MS4 had not yet occurred.  However, CLF fails to explain
how those factors impact PDA's assertion of the permit shield
defense.

As previously discussed, the EPA's permitting schemes for
industrial and municipal stormwater discharges are separate and
distinct.  Therefore (assuming that PDA is a regulated small
MS4), PDA's permit for its industrial stormwater discharges does
not obviate the Clean Water Act's requirement that PDA also
obtain a permit for municipal stormwater discharges.  But here,
as PDA points out, PDA is in a seemingly unique position.  See
Def.'s Reply in Supp. of Mot. to Dismiss at 16.  That is because
PDA currently has a pre-Phase II industrial stormwater permit
which it contends covers all stormwater discharges from the
Pease International.  And, assuming that PDA's Industrial Permit

does account for pollutants that are discharged by the Pease International as a result of stormwater (or that pollutants resulting from those discharges were within the reasonable contemplation of EPA), and that PDA is in full compliance with that permit, PDA's discharge of stormwater pollutants in compliance with its NPDES industrial permit would likely qualify for the permit shield defense.

But, says CLF, PDA has not, in fact, complied with the requirements for asserting the permit shield defense. CLF argues that PDA did not disclose its discharges of pollutants to the EPA, or comply with the Industrial Permit's terms. CLF's argument in that regard makes clear that the applicability of the permit shield defense cannot be resolved on a motion to dismiss in this case. The parties' arguments regarding the defense raise questions well beyond the factual allegations in CLF's complaint, and draw support from extrinsic evidence not properly before the court at this early stage of the litigation. Accordingly, at this juncture, the court denies PDA's motion to dismiss CLF's claim on the basis of the permit shield defense. PDA is, of course free to raise the defense at the summary judgement stage, supported by a fully developed record and briefing.

Finally, PDA argues that many of the violations asserted by CWA are duplicative.  The court agrees, specifically with respect to counts 4 through 7.  Each of those counts rely on 40 C.F.R. § 122.34(a)'s requirement that a permittee develop a stormwater management plan designed to reduce the discharge of pollutants from its MS4 to the "maximum extent practicable."  As PDA points out, it does not have, nor did it ever have, an MS4 permit, and therefore cannot have violated a permitting obligation to develop a stormwater management plan.  More critically, whether that purported violation can be remedied in a citizen suit under 33 U.S.C. § 1364 is a question to which neither party devotes sufficient attention.  Accordingly, the court declines to address PDA's argument that CLF's claims are duplicative until the parties have adequately briefed the issue.

## CONCLUSION

For the foregoing reasons, as well as those set forth in CLF's briefing, PDA's motion to dismiss CLF's complaint (document no. 10) is **GRANTED** in part, as set forth herein, but is otherwise **DENIED**.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 26, 2017

cc:  Trisha Grant, Esq.
     Matthew Wisnieff, Esq.
     Seth Kerschner, Esq.
     Thomas F. Irwin, Esq.
     Zachary K. Griefen, Esq.
     Dianne H. Martin, Esq.
     James P. Harris, Esq.