UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC. <br><br> Plaintiff, <br><br> v. <br><br> PEASE DEVELOPMENT AUTHORITY, et al. <br><br> Defendants. | Case No. 1:16-cv-00493-SM <br><br> **Settlement Agreement** |

**TABLE OF CONTENTS**

I.     DEFINITIONS.................................................................................................4

II.    SMALL MUNICIPAL SEPARATE STORM SEWER SYSTEM ("SMALL MS4") PROGRAM.................................................................................................8

III.   ATTORNEY FEES AND COSTS.................................................................20

IV.   PROGRAM CONCERNING PER – AND POLYFLUOROALKYL SUBSTANCES ("PFAS")........................................................................20

V.    RELEASES.................................................................................................21

VI.   DISMISSAL AND DISPUTE RESOLUTION .............................................23

VII.  MISCELLANEOUS PROVISIONS.............................................................25

VII.  ATTACHMENTS.......................................................................................29

WHEREAS, Plaintiff Conservation Law Foundation ("CLF") filed an action under the citizen suit provisions of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, alleging that Pease Development Authority and its Executive Director, David R. Mullen; its former Chairman, George M. Bald; its Vice Chairman, Peter J. Loughlin; and Board members, Robert A. Allard, Margaret F. Lamson, John Bohenko, Franklin Torr, and former member Robert Preston violated Sections 301(a) and 402 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311(a) and 1342, by discharging pollutants into waters of the United States from its Municipal Separate Storm Sewer System ("MS4") without a municipal separate storm sewer system permit issued by the Environmental Protection Agency, as set forth in CLF's Complaint;

WHEREAS, Defendants moved to dismiss CLF's claims and the District Court (as hereafter defined) dismissed some of CLF's claims;

WHEREAS, this Settlement Agreement will resolve the civil claims alleged in CLF's Complaint;

WHEREAS, CLF is a regional, nonprofit environmental organization;

WHEREAS, PDA owns and operates a municipal storm sewer system within urbanized areas, as described in Exhibit A to this Settlement Agreement, (the "PDA MS4"), located at the Pease International Tradeport and Airport ("Pease International"), a 3,000-acre property with 40 percent of its land in the City of Portsmouth and 60 percent of its land in the Town of Newington;

WHEREAS, PDA owns and/or operates additional facilities, including those listed on Exhibit B;

WHEREAS, CLF and Defendants (collectively, the "Parties"), in accordance with the terms of this Agreement, and without admission of facts or law, wish to finally and fully resolve all of their respective claims and defenses set out in the Complaint, all of those that could have arisen prior to and through the date of the Complaint, and those listed more particularly in

Paragraph 27 hereto, in each case to the extent such claims or defenses relate to any of the facilities listed on Exhibit A or the facility defined as Skyhaven on Exhibit B;

WHEREAS, in accordance with the terms of this Agreement, the Parties wish to retain the right to bring any claims and assert any defenses to the extent unrelated to the properties listed on Exhibit A or the facility defined as Skyhaven on Exhibit B, including such claims or defenses related to any facility listed on Exhibit B other than Skyhaven; and

NOW, THEREFORE, the Parties hereby agree:

## I.    DEFINITIONS

1.    Unless otherwise provided herein, terms used in this Settlement Agreement that are defined in the CWA or in regulations promulgated under the CWA shall have the meaning ascribed to them in the CWA or the regulations promulgated thereunder.  Whenever the terms listed below are used in this Settlement Agreement, the following definitions shall apply:

   a.    "Airport Zone" shall mean the Airport Zone described in Section 303.02(a) along with the Airport Industrial Zone described in Section 303.03(a) of the PDA Zoning Ordinance, Site Plan Regulations, and Subdivision Regulations (Revised to October 18, 2013).  The "Non-Airport Zone" shall mean those areas of Pease International that are not within the "Airport Zone."

   b.    "Article" shall mean a major portion of this Agreement identified by a Roman numeral.

   c.    "Clean Water Act," "Act" or "CWA" shall mean the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act), as amended, 33 U.S.C. §§ 1251, *et seq.*, along with its implementing regulations.

d.  "CLF Complaint" or "Complaint" shall mean the complaint filed by CLF against PDA on November 10, 2016 in the above-captioned matter.

e.  "Day" shall mean a calendar day. In computing any period of time under this Agreement, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next business day.

f.  "Defendant" or "PDA" (those terms shall be mutually interchangeable within this Agreement for convenience's sake only) shall mean the Pease Development Authority, its Executive Director, and its Board of Directors, and any past or future officer or Director of the PDA.

g.  "District Court" shall mean the United States District Court for the District of New Hampshire.

h.  "Effective Date" shall mean the Date upon which both of the following are satisfied: (i) this Settlement Agreement is entered into by the Parties and (ii) 45 days have elapsed since service of this Settlement Agreement in accordance with Paragraph 31 without objection by the United States.

i.  "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

j.  "Impervious Surface" shall mean a man-made surface that prevents the infiltration of water into the underlying soils and that is hydraulically connected to a receiving water by means of paved surfaces, gutters, drain pipes, or other conventional conveyance and detention structures that do not reduce runoff volume or provide Impervious Surface Treatment.

k.      "Impervious Surface Treatment" or "Treatment" shall mean using stormwater Best Management Practices (such as those from the New Hampshire Stormwater Manual as amended through December 2008) for Impervious Surfaces that reduce runoff volume or provide advanced stormwater management and pollutant removal through biofiltration (e.g., bioretention, bioswales, tree planters, gravel wetlands) and/or infiltration/filtration systems (*e.g.*, porous pavements, subsurface infiltration, sand filters, infiltration trenches).

l.      "Land Use Controls" shall mean any provision of the PDA Zoning Ordinance, Site Plan Regulations, and Subdivision Regulations (Revised to October 18, 2013) as of the Effective Date.

m.      "NH DES" or "NHDES" shall mean the New Hampshire Department of Environmental Services and any successor departments or agencies of the State.

n.      "NPDES" shall mean the National Pollutant Discharge Elimination System.

o.      "Paragraph" shall mean a portion of this Agreement identified by an Arabic numeral or an upper or lower case letter.

p.      "Parties" shall mean CLF and PDA (or Defendant).

q.      "Pease International" shall mean the Pease International Tradeport and Airport, a 3,000 acre property with 40 percent of its land in the City of Portsmouth and 60 percent of its land in the Town of Newington.

r.      "Plaintiff" or "CLF" shall mean Conservation Law Foundation, Inc.

s.      "Settlement Agreement" or "Agreement" shall mean this Settlement Agreement and all appendices and exhibits attached hereto.  In the event

6

of conflict between the main body of this Agreement and any appendix or exhibit, this Agreement shall control.

t.     "Small Municipal Separate Storm Sewer System" (or "Small MS4") shall have the meaning ascribed to it in 40 C.F.R. §§ 122.26(b)(8) and (16).

u.     "State" shall mean the State of New Hampshire.

v.     "Tenant" shall mean those persons or entities with which PDA has a lease agreement for the lease of property at Pease International, but shall not include any sub-lessees of such Tenants.

w.     In this Agreement, unless the context otherwise requires:

(i)     words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(ii)     references to Articles, Sections, Annexes, Attachments and Exhibits are references to articles, sections, annexes, attachments and exhibits of this Agreement;

(iii)     the descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(iv)     the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any provision of this Agreement;

(v)     "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed

by such words or words of similar import; and

(vi)     references to "Dollars", "dollars" or "$" without more are to the lawful currency of the United States of America.

## II.   SMALL MUNICIPAL SEPARATE STORM SEWER SYSTEM ("SMALL MS4") PROGRAM

2.     PDA will design and implement the following measures concerning the PDA MS4 in accordance with the paragraphs in this Article II:

a.     Submit an application for and/or supplementary information related to a NPDES Permit, renewal, or modification, for coverage of discharges subject to the Small MS4 permitting program in accordance with Paragraphs 4-6;

b.     Contract with Richard Claytor, P.E. (or a replacement as provided below), to assist it with the design of certain programs in accordance with Paragraph 7;

c.     Design and implement a public education and outreach program in accordance with Paragraph 8;

d.     Design and implement an illicit discharge detection and elimination system in accordance with Paragraphs 9-10;

e.     Design and implement a construction and post-construction runoff and control programs, and initiate its customary ordinance and/or regulation promulgation procedures for the promulgation of additional Land Use Controls governing construction and post-construction runoff and erosion in accordance with Paragraph 11;

    f.     Design and implement a pollution prevention and good housekeeping program in accordance with Paragraphs 12-14;

    g.     Provide annual reporting to CLF in accordance with Paragraph 15;

    h.     Design and construct Impervious Surface removal and/or Treatments in accordance with Paragraphs 17-21.

3.     As outlined above and described more particularly below, the provisions of this Settlement Agreement require PDA to design certain programs and/or systems after consulting with its consultants and receiving, through its consultant or counsel, feedback and input from CLF. Notwithstanding any such requirement for consultation, PDA shall have complete and exclusive decision-making authority over the final design of any program or system; provided that nothing in this Paragraph 3 shall limit CLF's rights under Article VI of this Agreement.

4.     The Parties acknowledge that PDA has submitted an application to EPA for an individual small MS4 Permit covering stormwater discharges from Pease International.  In addition, the Parties acknowledge that PDA had previously submitted in 2005 an application for renewal of its existing individual NPDES permit, and that EPA has not yet issued a permit pursuant to such application.  PDA agrees to apply for coverage of its stormwater discharges (including those discharges subject to the Small MS4 permitting program) from Pease International by either supplementing its individual small MS4 Permit application and/or supplementing its pending NPDES renewal application, after further consultation with EPA, and will include in the supplementation those additional terms and provisions EPA deems necessary to cover stormwater discharges from Pease International.  PDA will provide CLF a copy of the supplemental information referenced above that is submitted to EPA.  Nothing herein shall be construed as preventing CLF from commenting on the application for NPDES permit coverage or as limiting CLF's rights under applicable law relative to EPA's review of the permit application.

5.    Once granted, PDA shall maintain coverage under the permit EPA issues covering stormwater discharges so long as it operates (or contracts to operate) the PDA MS4, so long as such program exists under the Clean Water Act, and provided EPA does not require permitting of municipal stormwater discharges from Pease International under a different program.

6.    PDA shall not discharge pollutants to waters of the United States except in compliance with this Agreement, the provisions of any permit obtained pursuant to Paragraph 4 above, and/or the provisions of any other permit obtained by PDA governing such discharges. PDA shall at all times comply with the Clean Water Act. CLF reserves all rights with respect to any future noncompliance with the provisions of the Clean Water Act by PDA, except that only noncompliance to the extent related to the claims in CLF's Complaint may constitute breach of this Agreement. To the extent any requirement of this Agreement conflicts with any requirement of any state or federal statute, regulation, or permit, PDA shall be obligated only to comply with the applicable provision of law or permit.

7.    PDA will contract with Richard Claytor, P.E. or a replacement pursuant to this Paragraph (both defined as "Claytor") to provide consulting services to PDA on certain matters specified in this Article. Should Mr. Claytor be unwilling or unable to provide such services, the Parties will choose a mutually acceptable consultant. As between the Parties, PDA will have sole and exclusive authority over the contract terms with Claytor, including, without limitation, the scope of work, the term of the agreement, the payment terms (including total amount to pay for Claytor's services), and PDA's control over any of the consulting work; provided, that PDA may not terminate or replace Claytor without CLF's prior written consent, except in cases of default or breach by Claytor. As between the Parties, PDA will have sole and exclusive obligation to pay Claytor for any services provided by hereunder. As specified in this Article, Claytor (or any replacement) shall solicit CLF's input on various items, which

shall be communicated to PDA within seven (7) days of receipt. PDA, after consultation with Claytor, shall have the final decision, however, on the design of any component or program under this Article.

8.     Within ninety (90) days of the Effective Date and retention of Claytor (or a mutually acceptable replacement selected in accordance with paragraph 7) PDA shall, after consultation with Claytor, design a public education program to conduct outreach and distribute educational materials to PDA's Tenants about the impacts of stormwater discharges on water bodies and the steps Tenants can take to reduce pollutants in stormwater runoff. PDA shall notify CLF when it has approved a final design of its public education program. PDA shall implement the public education program within ninety (90) days of such approval. The public education program shall be designed in conjunction with Claytor, who shall solicit input from CLF prior to PDA's approval of the final design. Claytor and PDA may consider the following elements of a public education program, among others, in the design of the public education program:

a.     Informing Tenants about the steps they can take to reduce stormwater pollution, such as ensuring proper wastewater, septic, and stormwater system maintenance, ensuring the proper use and disposal of landscape and garden chemicals including fertilizers and pesticides, protecting and restoring riparian vegetation, and properly disposing of used motor oil or hazardous wastes. Non-exclusive examples of public education strategies include distributing brochures, email communiques, or fact sheets;

b.     Informing Tenants through email or other convenient means of waterbody restoration activities as well as activities that are conducted by environmental organizations or other citizen groups (excluding any

activities conducted by the U.S. Air Force or any other governmental entity with regard to CERCLA remediation activities), to the extent CLF notifies PDA of such activities through counsel; and

c.    Providing publicly available PDA Tenant contact information to CLF for purposes of providing information about stormwater impacts to local water bodies, information about public presentations or meetings concerning water quality of local water bodies, as well as mitigation efforts by CLF.

9.    Within one hundred and eighty (180) days of the Effective Date and retention of Claytor (or a mutually acceptable replacement selected in accordance with paragraph 7) PDA shall, after consultation with Claytor, develop an illicit discharge detection and elimination system for the PDA MS4. The system will be designed in conjunction with Claytor, who shall solicit input from CLF prior to PDA's final approval of the illicit discharge detection and elimination system.

a.    This illicit discharge detection and elimination system shall include the following components:

(i)    if not already completed, a storm sewer system map, showing the location of all outfalls and the names and location of all waters of the United States that receive discharges from those outfalls;

(ii)    a plan to detect and address non-storm water discharges, including illegal dumping, to the system; and

(iii)    Information for Tenants about the hazards associated with illegal discharges and improper disposal of waste.

b.   In accordance with N.H. Rev. Stat. § 12-G:13, PDA shall initiate its customary ordinance and/or regulation promulgation procedures for the promulgation of an ordinance, or other regulatory mechanism, that aims to prohibit non-storm water discharges into the storm sewer system and containing available and appropriate enforcement procedures, to the extent allowable under and consistent with State and local law, and the existing leases with Tenants;

c.   The illicit discharge program may address the following categories of non-storm water discharges or flows:  water line flushing, landscape irrigation, diverted stream flows, rising ground waters, uncontaminated ground water infiltration (as defined at 40 C.F.R. § 35.2005(b)(20)), uncontaminated pumped ground water, discharges from potable water sources, foundation drains, air conditioning condensation, irrigation water, springs, water from crawl space pumps, footing drains, lawn and landscape watering (including at the Pease International golf course), car washing, flows from riparian habitats and wetlands, dechlorinated swimming pool discharges, and street wash water (discharges or flows from firefighting activities are excluded from the effective prohibition against non-storm water and need only be addressed where they are

identified as significant sources of pollutants to waters of the United States).

    d.    In designing the illicit discharge program, PDA and Claytor shall consider whether to include the following components:

    (i)    Procedures for locating priority areas likely to have illicit discharges, which may include visual screening outfalls during dry weather and field tests of selected pollutants;

    (ii)    Procedures for tracing the source of an illicit discharge;

    (iii)    Procedures for removing the source of the discharge; and

    (iv)    Procedures for program evaluation and assessment.

10.    Within ninety (90) days of the PDA's approval, after consultation with Claytor, of the final design of the illicit discharge detection and elimination program, PDA shall implement the program.

11.    Within two-hundred and forty (240) days of the Effective Date and retention of Claytor (or a mutually acceptable replacement selected in accordance with paragraph 7) PDA shall, after consultation with Claytor, design and begin to implement a construction and post-construction site runoff and control program. The program will consist of the following elements:

    a.    In accordance with N.H. Rev. Stat. § 12-G:13, initiation of PDA's customary ordinance and/or regulation promulgation procedures for the promulgation of an ordinance or other regulatory mechanism requiring (i) submission of a stormwater management and erosion control plan during the site plan review process, and (ii) compliance with all applicable federal and state laws during construction and post-construction; to the extent such ordinance or regulatory mechanism is

allowable under and consistent with State and local law, and the existing leases with Tenants;

b.    Include a provision in all Site Plan Agreements that are submitted after the Effective Date, requiring compliance with all applicable federal and state laws;

c.    Include a provision in all Site Plan Agreements that are submitted after the Effective Date, requiring developers to provide PDA with a copy of all annual reporting required by the terms of any state or federal permit secured by the developer, including, without limitation, any Alteration of Terrain Permit;

d.    Consideration of other prospective construction and post-construction site runoff land use controls for the PDA MS4 in addition to what exists as of the Effective Date in the Land Use Controls. CLF shall provide to PDA through counsel input about additional land use controls concerning construction and post-construction site runoff. These potential additional controls may include the following:

(i)    Additional erosion and sediment controls (such as the erosion and sediment control best management practices associated with the requirements of 40 C.F.R. § 122.34(b)(4)), required beyond the existing controls located at Part 309 of the PDA Zoning Ordinance;

(ii)    Additional requirements beyond Section 309.02 of the PDA Zoning Ordinance for construction site operators to control waste such as discarded building materials, concrete truck washout, chemicals, litter, and sanitary waste at the construction

site that may cause adverse impacts to water quality;

(iii)    Additional requirements during site plan review concerning control of potential water quality impacts beyond those articulated in Part 304-A of the PDA Zoning Requirements and Sections 405.01, 405.07, 405.08, and 405.11 of the PDA Site Plan Review Regulations; and

(iv)    Additional enforcement mechanisms, including sanctions and/or inspections, as needed to ensure compliance to the foregoing, to the extent allowable under State or local law.

12.    Within three hundred sixty (360) days of the Effective Date and retention of Claytor (or a mutually acceptable replacement selected in accordance with paragraph 7) PDA shall design, after consultation with Claytor, a pollution prevention and good housekeeping program for municipal stormwater discharges from the PDA MS4. In addition to the street cleaning and other maintenance activities performed by the City of Portsmouth, the pollution prevention and good housekeeping program shall include:

a.    Annual visual inspections of Hodgson, Flagstone, and McIntyre Brooks, and Lower Grafton Ditch, and cleaning of man-made, visible debris;

b.    Written logs of such annual inspections and cleaning; and

c.    Employee training for non-administrative staff with the goal of preventing and reducing stormwater pollution.

13.    PDA and Claytor may consider additional elements in the design of the pollution prevention and good housekeeping program and CLF may provide input to PDA through counsel concerning same.

14.    Within ninety (90) days of PDA's approval, after consultation with Claytor, of the pollution prevention and good housekeeping program for the PDA MS4, PDA shall implement this pollution prevention and good housekeeping program.

15.    For a period of three years from the Effective Date, PDA shall provide to CLF an annual report detailing the following:

      a.     Results of the annual inspections outlined in Paragraph 12;

      b.     A summary of good housekeeping and maintenance activities carried out by PDA and/or the City of Portsmouth in the preceding year;

      c.     A copy of all correspondence for that year between and among PDA and EPA in connection with the matters addressed by this Agreement.

16.    PDA shall comply with any permit requirements imposed on it by EPA to (a) determine whether stormwater discharges from any part of the PDA MS4 contribute, either directly or indirectly, to a 303(d) listed water body; (b) include in the stormwater management program a section describing how the program will control the discharge of the pollutants of concern; and (c) ensure that the discharges will not cause or contribute to any violation of water quality standards. Any violation of any of the permit requirements above (or other permit requirements) shall not constitute a breach of this Agreement, but CLF retains all of its rights to bring a suit under the Clean Water Act or assert any other claim relating to such permit violation. Furthermore, PDA has not agreed to, and reserves all of its rights under applicable law to contest the imposition by EPA of any particular permit requirement, including any of the foregoing.

17.    Within five years of the Effective Date, PDA shall remove a minimum of five acres of Impervious Surface (calculated on a "Net" basis as explained below in Paragraphs 19-20); provided, that PDA may receive credit toward its five acre removal obligation through Treatment (again, calculated on a "Net" basis in accordance with Paragraphs 19-20). The

acreage credited toward removal by Treatment shall equal the acreage of Impervious Surface subject to Treatment.

18.    PDA shall have final and total decision-making authority with respect to the design and construction of any projects associated with the removal or Treatment of Impervious Surface, including, without limitation, the location of and budget for any such projects.  It may utilize its own staff or professionals of its choosing in the design and construction of such projects. CLF acknowledges that PDA may assert that removal or Treatment of Impervious Surface by PDA may satisfy both PDA's obligations under this Agreement as well as obligations PDA may have to EPA, DES, or any other governmental entity pursuant to the CWA, its regulations, permits, other laws and/or agreements.  The Parties agree that nothing in this Agreement shall be interpreted to bar such dual satisfaction.

19.    The "Net" removal and/or Treatment of acreage of Impervious Surface required by Paragraph 17 shall be calculated as the difference between (a) the area of Impervious Surface within the Non-Airport Zone as calculated by PDA as of the execution date of this Agreement, and (b) the area of Impervious Surface within the Non-Airport Zone as calculated by PDA on the fifth anniversary of the Effective Date.

20.    Notwithstanding anything to the contrary in the foregoing, in calculating "Net" removal and/or Treatment, the following shall apply:

a.    Any removal or Treatment of Impervious Surface in the Airport Zone shall be considered a reduction in the area of Impervious Surface within the Non-Airport Zone.

b.    Any new Impervious Surface will not be considered under Paragraph 19(b) if an Alteration of Terrain Permit has been granted for a project associated with that new Impervious Surface.   Nothing in this

Agreement, however, prohibits CLF from appealing or otherwise contesting the issuance of any such Alteration of Terrain Permit.

c.  Any area of Impervious Surface for which Treatment or removal is initiated within five years of the Effective Date, but which is not fully implemented prior to the fifth Anniversary of the Effective Date, shall be excluded from the area of Impervious Surface within the Non-Airport Zone as calculated in Paragraph 19(b); provided, however, that should any such development utilize Treatment resulting in a net reduction of Impervious Surface, i.e. greater than that required by an Alteration of Terrain permit, the reduction shall be deducted from the area of Impervious Surface within the Non-Airport Zone as calculated in Paragraph 19(b).

21. Prior to implementation of any project by PDA, the primary purpose of which is to remove or Treat Impervious Surface, CLF may provide input on the design of the project and have the opportunity to propose alternative designs within thirty (30) days of receiving notice of the project from PDA. Notwithstanding the foregoing, however, CLF shall not provide input or alternative designs for any project within the Airport Zone.

22. PDA and CLF (and Claytor provided his contract is still in force) shall meet (in person or telephonically) no less than twice per year in order to provide CLF with the opportunity to review the progress of all actions undertaken pursuant to this Agreement. The foregoing meetings may, at the option of either party, be through counsel.

23. PDA grants CLF and its representatives, assigns, agents, consultants, employees, officers, and attorneys access to publicly accessible portions of Pease International to allow CLF to track and account for Impervious Surface work, provided CLF provides at

least two days' advance notice of its intent to visit PDA premises for such tracking and accounting work.

### III.     ATTORNEY FEES AND COSTS

24.     PDA shall pay to CLF a total sum of Eight Hundred Thousand Dollars ($800,000) as full and complete satisfaction of CLF's claim for attorneys' fees and costs incurred or to be incurred in this matter, including any future attorneys' fees and costs relating to the implementation or monitoring of compliance with this Agreement.     The payment contemplated by this Paragraph shall be paid in two annual payments, with the first such payment in an amount of Four Hundred Thousand Dollars ($400,000) made upon the Effective Date.  The second payment, in the amount of Four Hundred Thousand Dollars ($400,000), shall be made within one year of the first payment.

### IV.     PROGRAM CONCERNING PER – AND POLYFLUOROALKYL SUBSTANCES ("PFAS")

25.     Within three hundred and sixty five (365) days of the Effective Date, PDA shall commence implementation of (1) the program attached hereto as Exhibit C and (2) a pilot project to evaluate the efficacy of certain emerging technologies that may be used to reduce the presence and/or effects of PFAS in surface waters at Pease International.  PDA shall have sole authority to determine the provider of pilot technology as well as the terms and conditions under which the pilot program shall be conducted.  The results of the pilot program conducted by PDA, after consultation with the vendor of the technology selected by PDA for study, when completed, shall be communicated to CLF in a manner acceptable to PDA within fourteen (14) days, but in no event shall include any attorney-client or attorney work-product materials.  PDA shall be solely responsible for all costs associated with the matters described in this Paragraph 25.

26.    The results of the program outlined in Exhibit C, when completed, shall be communicated to CLF in a manner acceptable to PDA within ninety (90) days of completion, but in no event shall include any attorney-client or attorney work-product materials.

## V.    RELEASES

27.    CLF, for itself and any and all members, officers, directors, representatives, assigns, agents, consultants, employees, officers, and attorneys thereof, including those who have held positions in the past, (collectively the "CLF Releasing Parties") covenants not to sue and releases the State of New Hampshire and, in their official and individual capacities, any and all officials, officers, employees, representatives, consultants, attorneys, and agents thereof, including those who have held positions in the past, the Pease Development Authority (and any and all subsidiaries, officers, directors, shareholders, representatives, assigns, agents, consultants, employees, officers, and attorneys thereof, including those who have held such positions in the past), in their individual and official capacities, the Pease Development Authority's Executive Director, David R. Mullen; the Pease Development Authority's former Chairman, George M. Bald; the Pease Development Authority's current Chairman, Kevin Smith; the Pease Development Authority's Vice Chairman, Peter J. Loughlin; and the Pease Development Authority's Board members, including without limitation, Robert A. Allard, Margaret F. Lamson, John Bohenko, Franklin Torr, and Robert Preston (all of the preceding to be called collectively the "State Releasing Parties") from any and all claims, causes of action, or liability to the extent such claim, cause of action or liability is related to (1) the allegations in the CLF Complaint (including without limitation any alleged unpermitted discharges from the PDA MS4 after the Effective Date but prior to the issuance of the permit(s) specified in Paragraph 4 hereto), (2) discharges from Pease International occurring prior to the Effective Date (including, without limitation, any discharges and/or violations related to the Pease Wastewater Treatment Plant), or (3) the presence or release of PFAS at or from Pease

21

International, or any of the locations or properties listed in Exhibit A, the facility defined as Skyhaven on Exhibit B, or any body of water or groundwater connected hydrologically to any of the locations or properties listed in Exhibit A or the facility defined as Skyhaven on Exhibit B.

28.    The State Releasing Parties covenant not to sue and release and discharge the CLF Releasing Parties from any and all claims, causes of action, or liability to the extent such claim, cause of action or liability is related to (1) the allegations in the CLF Complaint (including without limitation any alleged unpermitted discharges from the PDA MS4 after the Effective Date but prior to the issuance of the permit(s) specified in Paragraph 4 hereto), (2) discharges from Pease International occurring prior to the Effective Date (including, without limitation, any discharges and/or violations related to the Pease Wastewater Treatment Plant), or (3) the presence or release of PFAS at or from Pease International, or any of the locations or properties listed in Exhibit A, the facility defined as Skyhaven on Exhibit B, or any body of water or groundwater connected hydrologically to any of the locations or properties listed in Exhibit A or the facility defined as Skyhaven on Exhibit B.

29.    Notwithstanding anything to the contrary contained herein, the Parties retain all rights necessary to enforce the terms of this Agreement, including by the filing of a lawsuit, provided the Parties first abide by the dispute resolution provisions in Article VI. Neither this Agreement, nor the terms thereof, nor the performance of the terms thereunder by Defendants, shall constitute or be construed as an admission or acknowledgment by any Defendant of the factual or legal assertions contained in this Agreement or in CLF's Complaint, and Defendants retain the right to controvert in any subsequent proceedings,   other than proceedings for the purpose of implementing or enforcing this Agreement, the  validity of the facts or determinations contained in this Agreement or the Complaint.  Neither this Agreement, nor terms thereof, nor performance of the terms thereunder, shall constitute  or be construed as an

22

admission or acknowledgment by any Defendant of any liability, or an admission of violation of any law, by such Defendant or by its/their officers, directors, employees, agents, successors, or assigns.

30.    Except as provided in Paragraph 27, CLF does not, by consent to the Agreement, warrant or aver in any manner that Defendants' compliance with this Agreement will constitute or result in compliance with federal, state or local laws and regulations. Nothing in this Agreement shall be construed to affect or limit in any way the obligation of Defendants to comply with all federal, state, and local laws and regulations governing any activity required by this Agreement.

## VI.    DISMISSAL AND DISPUTE RESOLUTION

31.    Upon signing of this Agreement by the Parties, CLF shall (a) serve copies of this Agreement pursuant to 40 CFR § 135.5 and (b) file with the Court an Assented to Notice of Settlement and Lodging of Settlement Agreement Pending Review by the Department of Justice substantially similar to the form of Exhibit E attached hereto.

32.    Upon the Effective Date, the Parties shall file a Joint Motion for Stay, notifying the Court of the settlement and requesting that the Court indefinitely stay the case pending the satisfaction of the terms outlined below, after which time the case shall be dismissed with prejudice. Within five (5) days of satisfaction of all of the following terms, the Parties will jointly request the Court dismiss the case with prejudice pursuant to Fed. R. Civ. P. 41:

a.    Submission of the supplementation materials referenced in Paragraph 4;

b.    Initiation of implementation of the public education program referenced in Paragraph 8;

c.    Initiation of implementation of the illicit discharge program referenced in Paragraphs 9-10;

d.    Initiation of implementation of the construction and post-construction

23

site-runoff program referenced in Paragraph 11;

e.      Initiation of implementation of the pollution prevention and good housekeeping program referenced in Paragraphs 12-14; and

f.      Payment of the first annual payment of attorneys fees required by Paragraph 24.

33.     The Parties shall negotiate in good faith and use reasonable efforts to resolve any dispute, controversy, or claim arising from or related to this Agreement, including breach of this Agreement.

34.     If the Parties cannot resolve a dispute, controversy, or claim arising from or related to this Agreement through good faith negotiation, the Parties shall submit the dispute to a neutral mediator (the "Mediator"). Though neither Party waives its rights under State or Federal law, or any other applicable law, to bring an action to enforce the terms of this Agreement, before bringing such an action, the dispute shall be mediated in accordance with the provisions of this Article.

35.     A Party seeking to mediate a dispute arising from or related to this Agreement shall provide each other Party related to the dispute with a Mediation Notice. The Mediation Notice shall set forth the brief factual background of the dispute sought to be mediated and the Party's position with respect to such dispute. Each recipient of the Mediation Notice shall have thirty (30) calendar days either to respond to such Notice or, in the event of a dispute concerning a Notice recipient's alleged noncompliance with this Agreement, cure any alleged noncompliance.

36.     Within thirty (30) calendar days of the receipt of a response to a Mediation Notice, if the Parties cannot informally resolve their dispute, they shall commence mediation. The mediation shall take place in Concord, New Hampshire at a mutually agreeable time and location. The Mediator shall be chosen jointly by the parties. If the Mediator is not available

at the desired time and location, the Parties shall designate another mutually acceptable Mediator, or shall agree to postpone the mediation until the Mediator is available, where such postponement may not exceed ninety (90) days. The Parties shall negotiate in good faith and use their best efforts to resolve any dispute concerning the terms of this Agreement. The Parties shall engage in at least a full day of mediation in an effort to resolve their dispute, unless the Mediator concludes such negotiations are fruitless. The costs of the Mediator shall be borne equally by the Parties.

37.    Defendants will assent to the District Court's exercise of supplemental jurisdiction over any claim to enforce the terms of this Agreement. Defendants will not, however, waive any other defense or contention, including that of sovereign or Eleventh Amendment immunity or mootness.

## VII.    MISCELLANEOUS PROVISIONS

38.    This Agreement may be modified only upon written consent of the Parties.

39.    **Entire Agreement**. This Agreement constitutes the entire and exclusive agreement among the Parties concerning the subject matter hereof and supersedes all previous correspondence, communications, agreements and understandings, whether oral or written, among the Parties.

40.    **Notices.** Any notice, demand, copies of documents and other communications required to be made under the provisions of this Agreement (collectively, "Notices") by any Party hereto shall be effective only if in writing and (a) emailed, (b) personally served, (c) mailed by United States registered or certified mail, return receipt requested, postage prepaid, or (d) sent by a nationally recognized courier service (i.e., Federal Express) for next-day delivery, to be confirmed in writing by such courier. Notices shall be directed to the Parties at their respective addresses set forth below. Notices given in the foregoing manner shall be deemed to be given when (a) sent via email, (b) actually received or refused by the party to

whom sent if delivered by courier, or (c) if mailed, on the day of actual delivery as shown by the addressee's registered or certified mail receipt or at the expiration of three (3) business days after the date of mailing, whichever first occurs.

Notices for Plaintiff shall be sent to:

> Zachary K. Griefen, Esq.
> Conservation Law Foundation
> 15 East State Street, Suite 4
> Montpelier, VT 05602
> zgriefen@clf.org
> acharnov@clf.org

With a copy to:

> Seth Kerschner, Esq.
> Matthew Wisnieff, Esq.
> White & Case LLP
> 1221 Avenue of the Americas
> New York, NY 10020-1095
> seth.kerschner@whitecase.com
> matthew.wisnieff@whitecase.com

> Trisha Grant, Esq.
> White & Case LLP
> 701 Thirteenth Street, NW
> Washington, D.C. 20005-3807
> trisha.grant@whitecase.com

Notices for Defendants shall be sent to:

> Dianne Martin
> Senior Assistant Attorney General
> New Hampshire Department of Justice
> 33 Capitol Street
> Concord, NH 03301
> dianne.martin@doj.nh.gov

26

With a copy to:

> John-Mark Turner
> Lynn Preston
> Robert Cheney
> Sheehan Phinney Bass & Green, P.A.
> 1000 Elm Street, 17th Floor
> Manchester, NH 03101
> jturner@sheehan.com
> lpreston@sheehan.com
> rcheney@sheehan.com

Each Party shall promptly notify the other Party of any change in the above-listed contact information by using the procedures set forth in this Paragraph.

41. **Authorization.** Each person signing this Agreement represents and warrants that s/he has been duly authorized to enter into this Agreement by the Party on whose behalf it is indicated that the person is signing.

42. **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective representatives, heirs, executors, administrators, successors, officers, directors, agents, attorneys, employees and permitted assigns.

43. **Interpretation.** The provisions contained herein shall not be construed in favor of or against any Party because that Party or its counsel drafted this Agreement, but shall be construed as if all Parties prepared this Agreement, and any rules of construction to the contrary are hereby specifically waived. The terms of this Agreement were negotiated at arm's length by the Parties hereto.

44. **Headings**. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

45.    **Counterparts**. Facsimile, electronic and scanned signatures shall be deemed to be originals for all purposes. Copies of the original Agreement, whether transmitted by facsimile or other means, shall be effective. This Agreement may be signed in counterparts.

46.    **Severability**. In the event that any of the provisions of this Agreement are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

47.    **Force Majeure**. For purposes of this Agreement, a "Force Majeure event" is defined as any event arising from causes beyond the control of a Party, including its contractors and subcontractors, that delays or prevents the timely performance of any obligation under this Agreement notwithstanding that Party's best efforts to avoid the delay. The deadline for the responsibility to perform any action under this Agreement may be extended for up to the number of days of nonperformance caused by the Force Majeure event, provided the delayed Party complies with the notice requirements of Paragraph 40 (Notices). Examples of events which may constitute Force Majeure events include severe weather events, natural disasters, and national, state or regional emergencies. Examples of events that are not Force Majeure events include, but are not limited to, normal inclement weather, unanticipated or increased costs or expenses of work, a Party's financial difficulty in performing such work and acts or omissions attributable to a Party's contractors or representatives.

48.    If any event occurs that may delay or prevent the performance of any obligation under this Agreement, whether or not caused by a Force Majeure event, the Party incurring the delay shall notify the other Party via email within five (5) working Days after the Party incurring the delay first knew or should have known that the event might cause a delay. Within five (5) additional working Days thereafter, the Party incurring the delay shall submit to the other Party, at the addresses specified in Paragraph 40 (Notices), a written explanation of the cause(s) of any actual or expected delay or noncompliance, the anticipated duration of any

delay, the measure(s) taken and to be taken to prevent or minimize the delay, a proposed schedule for the implementation of such measures. Notifications required by this Paragraph shall be provided consistent with the contact information provided in Paragraph 40. Nothing in this Agreement should be taken to change or amend existing reporting requirements established by NHDES or EPA.

49. **Subordination to Federal Authority.** The Parties acknowledge that PDA has legally binding obligations to the federal government under the specific federal statutes, regulations, grant assurances, and agreements and instruments conveying the property of the former Pease Air Force Base to the State of New Hampshire and specifically identified on Exhibit D (collectively, "Applicable Laws and Agreements"). Moreover, if the Federal Aviation Administration ("FAA") or the U.S. Department of Transportation ("DOT") or its Inspector General advises in writing, or the FAA or any court of competent jurisdiction determines, that any provision of this Agreement is inconsistent with such Applicable Laws and Agreements, then such provision shall be void and unenforceable, and the Parties shall negotiate in good faith to modify the provision to conform to the Applicable Laws and Agreements in question. By signing this Agreement, PDA acknowledges that it has conducted an independent evaluation of the terms of this Agreement, has concluded that the terms of this Agreement are not in conflict with Applicable Laws and Agreements and affirms that it will not seek opinions to the contrary from the FAA, DOT or any other federal authorities.

## VII.    ATTACHMENTS

50. The following attachments are attached to and part of this Agreement: "Exhibit A" describes the PDA MS4 owned and operated by PDA. "Exhibit B" describes additional facilities owned or operated by PDA for which, with the exception of Skyhaven, the Parties wish to retain the right to bring any claims and assert any defenses. "Exhibit C" describes the PFAS initiative described in Paragraphs 25-26. "Exhibit D" lists the "Applicable Laws and

Agreements" as defined in Paragraph 49. "Exhibit E" is form of Assented to Notice of Settlement and Lodging of Settlement Agreement Pending Review by the Department of Justice the Parties shall file with the Court.

**CONSERVATION LAW FOUNDATION, INC.**

By: _____ Date:_ January 11, 2019

     Bradley M. Campbell
     President
     Conservation Law Foundation
     62 Summer Street
     Boston, MA  02110


**PEASE DEVELOPMENT AUTHORITY, ET AL**

By: _____ Date:_ 1/11/19

     Kevin Smith
     Chairman of the Board of Directors
     Pease Development Authority
     55 International Drive
     Portsmouth, NH  03801

## Exhibit A

1.  The PDA MS4 consists of the conveyance and systems of conveyances owned or operated by the PDA on behalf of the State of New Hampshire designed and/or used for collecting stormwater associated with the following properties held in fee by the PDA on behalf of the State of New Hampshire as described in the deeds recorded in the Rockingham County Registry of Deeds at Book 3438, Pages 1860-1879; Book 4227, Pages 0001-0214; Book 4564, Page 985; Book 4784, Page 2654; Book 4787, Page 1612; Book 4884, Page 2793; Book 4951, Page 2793; Book 5360, Page 2092. Those properties consist of

    a.  the office and industrial park, including ancillary facilities, doing business as Pease International Tradeport, located or doing business at 55 International Drive, Portsmouth, New Hampshire 03801;

    b.  the public airport doing business as Portsmouth International Airport (PSM), located at 36 Airline Avenue, Portsmouth, New Hampshire 03801; and

    c.  the 27-hole public golf course and ancillary facilities, including driving range, practice greens, clubhouse, and restaurant, doing business as Pease Golf Course, located at 200 Grafton Drive, Portsmouth, New Hampshire 03801.

**Exhibit B**

1.    The public and private airport doing business as Skyhaven Airport (DAW), located at 238 Rochester Hill Road, Rochester, New Hampshire 03867 ("Skyhaven").

2.    The marine terminal, passenger vessel docks, commercial fishing docks, moorings, and ancillary facilities managed by the Division of Ports and Harbors, doing business as the Division of Ports and Harbors, the Port of New Hampshire, or the Market Street Marine Terminal, located at 555 Market Street, Portsmouth, New Hampshire 03801.

## Exhibit C

PDA will contract with a consultant to conduct a review of the scientific literature on the bioaccumulation and toxicity of PFAS in aquatic plants and animals on the Tradeport. The consultant will identify the types of aquatic plants and animals known to be present in surface waters on the Tradeport, or affected by those surface waters (based on available studies), and then review PFAS-related bioaccumulation and aquatic toxicity literature to draw conclusions regarding potential impacts generally on aquatic plants and biota, and to the extent possible on the specific potential receptors of Tradeport surface waters.

## Exhibit D

49 U.S.C. § 46301(a)(3);
49 U.S.C. § 47106(d);
49 U.S.C. § 47107(b)(1);
49 U.S.C. § 47111(e) and (f).
49 U.S.C. § 47133(a);
64 Fed. Reg. 7696 *et seq.* (FAA Policies and Procedures Concerning the Use of Airport Revenue);
FAA Grant Assurance No. 25; and
Quitclaim Deed from the United States to the Pease Development Authority, dated October 15, 2003, at p. 12, ¶ 17.

**Exhibit E**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC. | ) ) ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 1:16-cv-00493-SM |
| PEASE DEVELOPMENT AUTHORITY, et al | ) ) ) | |
| Defendants. | ) ) ) | |

**Joint Notice of Settlement, Lodging of Settlement Agreement Pending DOJ Review, and Request for Stay of Deadlines**

The Parties hereby respectfully provide notice to the Court that they have settled the above-captioned matter and lodge the attached fully-executed Settlement Agreement, pending the conclusion of the 45-day review period established by the Clean Water Act and its regulations. 33 U.S.C. 1251 *et seq.* and 40 C.F.R. 135.5(b).

Plaintiff's undersigned counsel will send copies of the fully-executed Settlement Agreement to the Administrator, Environmental Protection Agency ("EPA"), Washington, DC 20460, as well as to the United States Department of Justice ("DOJ"), Citizen Suit Coordinator, Environment and Natural Resources Division Law and Policy Section, P.O. Box 7415, Ben Franklin Station, Washington, D.C. 20044-7415

The Parties submit the attached Settlement Agreement to the Court for informational purposes only. At the expiration of the 45-day review period set forth in 33 U.S.C. § 1365(c)(3) and the satisfaction of the terms outlined in Paragraph 32 of the attached

Settlement Agreement, the Parties will jointly move the Court dismiss the above-captioned matter, with prejudice, pursuant to Fed. R. Civ. P. 41.

In light of the Parties' negotiated resolution of this matter, and their intention to jointly move this Court to dismiss this matter with prejudice after the 45-day review period set forth in 33 U.S.C. § 1365(c)(3) and satisfaction of the terms set out in Paragraph 32 of the Settlement Agreement, the Parties respectfully request that this Honorable Court stay all pending deadlines in this case.

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.

Dated: January __, 2019

By its attorneys,

/s/ Thomas F. Irwin
Thomas F. Irwin, Esq.
Conservation Law Foundation
NH Bar No. 11302
27 North Main Street
Concord, NH 03301
(603) 225-3060
tirwin@clf.org

/s/ Zachary K. Griefen
Zachary K. Griefen, Esq.
Conservation Law Foundation
NH Bar No. 265172
15 East State Street, Suite 4
Montpelier, VT 05602
802.223.5992 x4011
zgriefen@clf.org

/s/ Seth Kerschner
Seth Kerschner, Esq.
Pro hac vice
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8630
seth.kerschner@whitecase.com

/s/ Matt Wisnieff
Matt Wisnieff, Esq.
Pro hac vice
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8248
matthew.wisnieff@whitecase.com

PEASE DEVELOPMENT AUTHORITY AND INDIVIDUAL DEFENDANTS

Dated:  January __, 2019

By their attorneys,

GORDON J. MACDONALD, ATTORNEY GENERAL

By:/s/ Dianne H. Martin
Dianne H. Martin, Asst. Atty. General (#15350)
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301-6397
(603) 271-3671
Dianne.martin@doj.nh.gov

       AND

 SHEEHAN, PHINNEY, BASS & GREEN, P.A.

By:/s/ John-Mark Turner
John-Mark Turner (#15610)
Sheehan Phinney Bass & Green, P.A.
1000 Elm Street, P.O. Box 3701
Manchester, NH  03101
(603) 627-8143
jturner@sheehan.com

**CERTIFICATE OF E-SERVICE**

I hereby certify that the Parties' foregoing document, filed electronically through the ECF system with the Court on January __, 2019, has been sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, if any, on January __, 2019.

/s/ Zachary K. Griefen
Zachary K. Griefen, Esq.
Conservation Law Foundation
NH Bar No. 265172
15 East State Street, Suite 4
Montpelier, VT 05602
802.223.5992 x4011
zgriefen@clf.org

Dated January __, 2019